**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| SABERTOOTH, LLC, | : | |
| GREEN GOBLIN, INC., | : | Bky. No. 09-11237 ELF |
| | : | |
| Debtors. | : | JOINTLY ADMINISTERED |
| | : | |
| | : | |
| SABERTOOTH, LLC, | : | |
| GREEN GOBLIN, INC., | : | |
| | : | |
| Plaintiffs, | : | Adv. No. 09-067 ELF |
| | : | |
| v. | : | |
| | : | |
| WARREN SIMONS, | : | |
| | : | |
| Defendant. | : | |

# O P I N I O N

## I.  INTRODUCTION

On January 22, 2009, Venom, Inc. ("Venom") filed a voluntary petition for relief under

chapter 11 of the Bankruptcy Code in a case docketed at Bky. No. 09-10445.  On February 23,

2009, two Venom affiliates, Sabertooth, LLC ("Sabertooth") and Green Goblin, Inc. ("Green

Goblin"), filed their own chapter 11 petitions, docketed at Bky Nos. 09-11237 and 09-11239,

respectively.  Shortly thereafter, an order was entered providing for the joint administration of

the three bankruptcy cases.[1]

---

[1]        Initially, the joint administration of these bankruptcy cases was centralized on the Venom
bankruptcy docket.  (See Bky. No. 09-10445, Doc # 92).  On February 24, 2010, Venom's case was
converted to chapter 7.  (See Bky. No. 09-10445, Doc # 432).  Thereafter, Sabertooth and Green Goblin's
cases remained jointly administered under Sabertooth's docket number (Bky. No. 09-11237, Doc # 75).

On March 6, 2009, all three debtors commenced this adversary proceeding by filing a Complaint against Defendants Warren Simons and Alan Simons, asserting a claim for breach of contract and requesting both compensatory and punitive damages.  Before any responsive pleading was filed, the Plaintiffs filed an Amended Complaint that omitted the request for punitive damages.  Thereafter, disposition of Motions to Dismiss the Amended Complaint and the Second Amended Complaint resulted in the dismissal of Venom as a party plaintiff. Subsequently, on December 18, 2009, Sabertooth and Green Goblin stipulated to the dismissal of their claim against Defendant Alan Simons, leaving Warren Simons as the sole defendant.

Meanwhile, on June 30, 2009, Warren Simons (hereafter, "Simons") filed a proof of claim, in the amount of $1,926,805.94, which identified Venom as the "debtor."  (Bky. No. 09-10445, Claim No. 26-1).  On July 20, 2009, Venom filed an objection to Simons' proof of claim. (Bky. No. 09-10445, Doc. # 189).  On August 21, 2009, Simons filed an amended claim, in the amount of $1,107,450.14, which identified all three debtors as the debtor.  After a number of continuances, by agreement of the parties and order dated October 22, 2009, the hearing on the claims objection was consolidated with the trial of this adversary proceeding.  (Bky. No. 09-10445, Doc. # 290).[2]  The bases for the claims objection and the breach of contract claim asserted in the adversary proceeding are substantially the same, if not identical.

On June 11, 2010, the Plaintiffs filed a Motion for Partial Summary Judgment ("the Plaintiffs' Motion").  (Adv. No. 09-67, Doc. # 105).  On June 29, 2010, Simons filed a Response

---

[2]        Although the objection was filed by only by Venom, Sabertooth and Green Goblin appear to have assumed that the they may press the objection against the amended proof of claim that apparently was asserted in their respective bankruptcy estates.  See Plaintiff's Motion for Partial Summary Judgment ¶40 (Adv. No. 09-67, Doc # 103).

to the Plaintiffs' Motion, which included what was styled as a "Cross Motion for Partial

Summary Judgment," asserting that he is entitled to judgment as a matter of law on all of the

Plaintiffs' claims.[3]  Later, on August 3, 2010, presumably as a "fall back" in the event that his

Cross-Motion were denied, Simons filed a second Motion for Partial Summary Judgment on the

Issue of Damages.  (Adv. No. 09-67, Doc. # 124).  The parties completed briefing all pending

matters on October 4, 2010.

     For the reasons set forth below, I conclude:

     (1) this court lacks subject matter jurisdiction over Sabertooth's claim against
         Simons, requiring dismissal of the Sabertooth's claim without prejudice; and,

     (2) all of the motions for partial summary judgment should be denied;

     (3) there is no genuine issue of fact as to one of the issues in the proceeding:
Green         Goblin was not an intended third party beneficiary of an agreement entered
         into by two of its creditors, Business Loan Center, Inc. and Simons.

## II.  FACTUAL BACKGROUND

     The following facts are not in dispute.

### the formation and purpose of the entities

     Venom is a business entity created in 1996 by Kevin and Teresa Burke and John

DePrince (collectively, "the Principals") for the purpose of owning and operating a Gold's Gym

---

[3]      During a teleconference with the court, the parties agreed to treat Simons' Response to
the Plaintiffs' Motion for Partial Summary Judgment as a cross motion for partial summary judgment and
established a schedule for the Plaintiffs to file a response to the Cross-Motion.  (See Adv. No. 09-67, Doc.
# 118).

franchise in Conshohocken, Pennsylvania.[4]  The Principals subsequently formed two other

business entities.  The first entity (Sabertooth) was formed to purchase and own a prospective

property for the operation of the prospective Gold's Gym franchise.  The second entity (Green

Goblin) was formed to serve as the operating entity for the Principals' second gym enterprise.


**the June 27, 2001 transaction**

On June 27, 2001, Sabertooth and Green Goblin entered into a transaction for the

purchase of the real property located 431 West Valley Forge Road, King of Prussia, PA (the

"Property") and other assets from Joseph and Anne Proietto ("the Proiettos").  Sabertooth

purchased the real property from the Proiettos for $2.5 million.  Green Goblin purchased the

assets located on the real property, which included a building and the personal property therein,

for $600,000.00.

The financing for the transaction came from three sources:

> (1) Harleysville National Bank and Trust Company loaned Sabertooth $1.5
>     million, secured by a first priority mortgage on the Property;
>
> (2) Business Loan Center, Inc. ("BLC") loaned Green Goblin $1.3 million,
>     secured by a second priority mortgage on the Property;[5] and
>
> (3) the Proiettos financed $600,000.00, through two notes (collectively, "the
>     Proietto Notes") as follows:

---

[4]      During the course of Venom's bankruptcy case, the Conshohocken gym closed and, as
stated earlier, see n.1, supra, Venom's chapter 11 case was converted to chapter 7.  The history of
Venom's business operations in Conshohocken have no direct bearing on the present dispute between the
Plaintiffs (Sabertooth and Green Goblin) and Simons.


[5]      Both the Harleysville and BLC loans were guaranteed by Venom.

- a $475,000.00 note given by Green Goblin (and guaranteed by Sabertooth)[6] ("the Proietto-Green Goblin Note");

- a $125,000.00 note given by Sabertooth ("the Proietto-Sabertooth Note");

- the Proietto-Sabertooth Note and the Sabertooth guarantee of the Proietto-Green Goblin Note being secured by a third priority mortgage on the Property ("the Sabertooth Mortgage").

Certain other aspects of these transactions are significant for purposes of this adversary proceeding and the pending motions.

As a condition of granting the loan to Green Goblin, BLC required the Proiettos to delay collection on the Proietto Notes and enforcement of the Sabertooth Mortgage until certain conditions were met.  As a result, the Proiettos and BLC entered into two Standby Creditor Agreements (the "Standby Agreements"), one for each of the Proietto Notes.  Each Standby Agreement provided, in material part:

> To induce Business Loan Center, Inc. (Lender) to make an SBA guaranteed loan to Standby Borrower or guaranteed by Standby Borrower  . . . Standby Creditor agrees:
>
> 1.  To accept payments of principal and interest after the occurrence of :
>
>     a.  two years having passed from the date of closing; and
>
>     b.  Standby Borrower showing on a consolidated basis and acknowledged by Lender, two years of 1.25:1 cash flow/debt service coverage as defined by Generally Accepted Accounting Principles.
>
> * * *
>
> 3.  To take no action to enforce claims against Standby Borrower on the

---

[6]    (See Exhibit P, Plaintiff's Motion for Partial Summary Judgment).   Hereafter, unless otherwise noted, citations to exhibits refer to the exhibits attached to the Plaintiffs' Motion for Partial Summary Judgment.

Standby Loan until Lender's Loan is satisfied.

4.  To take no action against Standby Borrower's collateral, without written consent from the Lender, until Lender's Loan is satisfied.

* * *

7.  This Agreement applies to any successor to the Standby Creditor or assignee of this Agreement or of Standby Creditor's Loan, including any bankruptcy trustee or receiver or guarantors or sureties of Standby Creditor Loan.

(Exs. G, H).

Neither Sabertooth nor Green Goblin was a signatory to the Standby Agreements.

The repayment provision in each of the Proietto Notes was substantially the same,

requiring repayment

in sixty consecutive monthly installments of principal and interest . . . per month commencing on the first day of August, 2001 and continuing on the first day of each month thereafter, with a final payment of all then outstanding principal and all unpaid and accrued interest due and payable on the sixty month anniversary of this Note.

The Proietto Notes also qualified the repayment terms by reference to the Standby

Agreements, using nearly identical language to that found in Paragraph 1 of the Standby

Agreements:

In accordance with a certain Standby Creditors Agreement dated this date and executed by Payees (the "Standby Agreement"), no principal or interest payments for the first two (2) years from the date of this Notes [sic] shall be made and payment of principal and interest will be permitted only after the occurrence of: (a) two (2) years having passed from the date of the Note and (b) Maker shall show on a consolidated basis two (2) years of 1.25:1 cash flow/ debt service coverage as defined by generally accepted accounting principles. When principle and interest payments are permitted to be made under the Standby Agreement, Maker shall pay to Payees all accrued and unpaid interest and principal then due in accordance with the Amortization Schedule.

Finally, Paragraph 16 of the Sabertooth Mortgage included a confession of judgment

6

provision, authorizing the entry of judgment by confession against Sabertooth in the event of "any default" of any provision of the Proietto Notes or the Sabertooth Mortgage.

### assignment to Simons and the confession of judgment

On April 27, 2006, the Proiettos assigned the Proietto Notes and the Sabertooth Mortgage to Simons for $1.00.  On July 17, 2006, Simons confessed judgment against Sabertooth in the Court of Common Pleas, Montgomery County, Pennsylvania ("the State Court"), in the amount of $933,575.14.[7]  Sabertooth filed a Petition to Open and/or Strike the Confession of Judgment ("the Petition to Open") on August 14, 2006.  The State Court entered an Order on September 21, 2006, providing that the Petition to Open would be placed upon the argument list upon the completion of discovery and the filing of a Praecipe, but no Argument Praecipe was filed prior to the prior to the commencement of Sabertooth's bankruptcy case in this court.[8]  Currently, Simons' judgment against Sabertooth remains in effect.

---

[7]   The amount attributable to the Proietto-Sabertooth Note was $198,453.21.  The amount attributable to the Sabertooth guarantee of the Proietto-Green Goblin Note was $735,121.93.  (Ex. P).

[8]   Recently, the Plaintiff's counsel advised the court that on December 13, 2010, Sabertooth filed an "Argument Praecipe".  (Adv. No. 09-67, Doc. # 145).  But see In re Graves, 33 F.3d 242, 247-48 (3d Cir. 1994) (§362(a) stays debtor's motion to open judgment in action originally commenced against the debtor) (citing Assoc. of St. Croix Condominium Owners v. St. Croix Hotel Corp., 682 F.2d 446, 448 (3d Cir. 1982)); see also n.16, infra.  Sabertooth and Green Goblin have since filed a Motion for Relief from the Automatic Stay Nunc Pro Tunc, which is scheduled to be heard on January 19, 2011.  (Bky. No. 09-11237, Doc. #'s 200, 202).

### III.  THE <u>ROOKER-FELDMAN</u> DOCTRINE

Upon review of the summary judgment motions and supporting memoranda, I raised <u>sua sponte</u> the issue whether the adversary proceeding should be dismissed for lack of subject matter jurisdiction under the <u>Rooker-Feldman</u> doctrine and invited the parties to brief the issue.  <u>See, e.g.</u>, <u>Nesbit v. Gears Unlimited, Inc.</u>, 347 F.3d 72, 76 -77 (3d Cir. 2003), <u>cert. denied</u>, 541 U.S. 959 (2004) (a federal court has the independent duty to consider its subject matter jurisdiction and to consider <u>sua sponte</u>, if necessary, whether subject matter jurisdiction exists); <u>Packard v. Provident Nat'l Bank</u>, 994 F.2d 1039, 1049 (3d Cir.), <u>cert. denied</u>, 510 U.S. 964 (1993) ("[i]t is axiomatic that federal courts are courts of limited jurisdiction, and as such are under a continuing duty to satisfy themselves of their jurisdiction before proceeding to the merits of any case").  The parties then submitted memoranda of law in support of their respective positions.  (Adv. No. 09-67, Doc. #s 142, 143).

### A.

The <u>Rooker-Feldman</u> doctrine is derived from the two Supreme Court cases, <u>Rooker v. Fidelity Trust Co.</u>, 263 U.S. 413, 415-16 (1923), and <u>District of Columbia Court of Appeals v. Feldman</u>, 460 U.S. 462, 483-84 (1983).  The doctrine is rooted in the statutory propositions that federal district courts are courts of original, not appellate, jurisdiction and that the United States Supreme Court is the only federal court that has jurisdiction to review final judgments from a state's highest court.  <u>See</u> 28 U.S.C. §1257(a); <u>Exxon Mobil Corp. v. Saudi Basic Indus. Corp.</u>, 544 U.S. 280, 284-85 (2005).  Simply put, the <u>Rooker-Feldman</u> doctrine divests a lower federal court of subject matter jurisdiction of an action if the relief requested would effectively reverse a

8

state court decision or void its ruling.  See, e.g., Turner v. Crawford Square Apts. III, L.P., 449

F.3d 542, 547 (3d Cir. 2006); In re Knapper, 407 F.3d 573, 580 (3d Cir. 2005).

Rooker-Feldman is considered a "narrow doctrine."  Lance v. Dennis, 546 U.S. 459,

464-66 (2006).  It is "confined to cases of the kind from which the doctrine acquired its name:

cases brought by state-court losers complaining of injuries caused by state-court judgments

rendered before the district court proceedings commenced and inviting district court review and

rejection of those judgments."  Exxon Mobil Corp., 544 U.S. at 284.

For a number of years, many courts in this Circuit applied a two-part test in evaluating

whether the Rooker-Feldman doctrine applied:

> (1) if the federal claim was actually litigated in state court prior to the filing of the
> federal action; or,
>
> (2) if the federal claim was "inextricably intertwined" with the state adjudication,
> meaning that federal relief can only be predicated upon a conviction that the
> state court was wrong.

E.g., Knapper, 407 F.3d at 580; McClain v. Bank of New York, 2010 WL 1837908, at *2 (E.D.

Pa. Apr. 29, 2010); Krankowski v. O'Neil, 2010 WL 1329033, at *5 (M.D. Pa. Mar. 26, 2010);

Goodson v. Maggi, 2010 WL 1328687, at *11 (W.D. Pa. Mar. 1, 2010); In re Calabria, 418 B.R.

862, 866 (Bankr. W.D. Pa. 2009); In re Stivala Investments, Inc., 391 B.R. 276, 279 (Bankr.

M.D. Pa. 2008); In re Randall, 358 B.R. 145, 154 (Bankr. E.D. Pa. 2006).

Last year, in Great Western Mining & Mineral Co. v. Fox Rothschild LLP, 615 F.3d 159

(3d Cir. 2010), the Court of Appeals altered the Rooker-Feldman analysis to be employed by

courts in this Circuit.  The court instructed the lower courts in this Circuit to cease considering

whether the federal claim was "inextricably intertwined" with the state court judgment.  Id. at

170 ("The phrase 'inextricably intertwined' does not create an additional legal test or expand the

scope of <u>Rooker-Feldman</u>").  The court articulated the following four-part test for dismissal of a

federal claim for lack of subject matter jurisdiction based on <u>Rooker-Feldman</u>:

>    (1) the federal plaintiff lost in state court;
>
>    (2) the plaintiff complains of injuries caused by the state court judgment;
>
>    (3) those judgments were rendered before the federal suit was filed; and,
>
>    (4) the plaintiff is inviting the federal court to review and reject the state
>        judgments.

<u>Id</u>. at 166.

      The court's commentary regarding this new test provides assistance in the application of

the revised <u>Rooker-Feldman</u> test.

      First, the court observed that the second and fourth elements of the test are "key to

determining whether a federal suit presents an independent, non-barred claim."  <u>Id</u>.

      Focusing on the second requirement  –  that the injuries be caused by the state court

judgment  –  the court stated that "when the source of the injury is the defendant's actions (and

not the state court judgments), the federal suit is independent, even if it asks the federal court to

deny a legal conclusion reached by the state court."  <u>Id</u>. at 167.  The "critical task" is to

distinguish such cases from those federal lawsuits that profess to complain of an injury caused

by a third party, "but actually complain of injury 'produced by a state-court judgment and not

simply ratified, acquiesced in, or left unpunished by it.'"  <u>Id</u>. (quoting <u>Hoblock v. Albany County

Board of Elections</u>, 422 F.3d 77, 88 (2d Cir. 2005)).

      One "guidepost" in distinguishing between the two situations is to determine "whether

the injury complained of in federal court existed prior to the state-court proceedings and thus

could not have been 'caused by' those proceedings."  <u>Id</u>. at 167.  If the federal complaint

presents an independent claim, "there is jurisdiction . . .  even if that claim denies a legal

conclusion reached by the state court."  Id. at 169 (citing Exxon Mobil, 544 U.S. at 293).

The Great Western Mining court acknowledged that application of the test becomes more

"complicated" when the plaintiff complains of an injury that is "related" in some fashion to the

state court proceeding.  Id. at 168.  However, it is possible to distinguish claims related to prior

state court judgments that are barred by the Rooker-Feldman doctrine from those that are not.

For example, a claim that a judgment was procured by fraud is independent of the judgment and

therefore, does not fall within the Rooker-Feldman doctrine, while a claim that the judgment

itself is illegal does.  Id.[9]

The fourth requirement of the Rooker-Feldman test – whether the plaintiff seeks review

of a state court judgment – requires the court to distinguish between federal actions that require

the federal court to determine that the prior judgment was correctly decided (appellate review)

---

[9]        The Court of Appeals applied this distinction in the case before it.  In Great Western
Mining, the plaintiff's assignor brought a legal malpractice case against its former counsel.  By
agreement, the malpractice action was submitted to binding arbitration.  The arbitration resulted in an
award against the plaintiff's assignor.  The plaintiff-assignee unsuccessfully sought to set aside the
arbitration award in state court.  The plaintiff also filed a separate action in state court against the
arbitrator and counsel for one of the malpractice defendants asserting contract and tort claims.  That
separate action also was unsuccessful.  After the state court appeals in both matters were exhausted, the
plaintiff filed a federal action alleging that due to a corrupt relationship between and among the
defendant's counsel, the arbitrator and the state court, it was deprived of its constitutional right to due
process.  The Court of Appeals held that Rooker-Feldman did not apply:

> [The plaintiff] is not merely contending that the state-court decisions were
> incorrect or that they were themselves in violation of the Constitution. Instead,
> [the plaintiff] claims that "people involved in the decision violated some
> independent right," that is, the right to an impartial forum.

Great Western Mining, 615 F.3d at 172.

from federal actions that try the issue anew in the federal court (not appellate review).[10] Admittedly, this requires the federal court to draw a very fine distinction.

Further, the inquiry under the fourth requirement is "closely related" to the second requirement.  As closely related as the second and fourth requirements may be, the Great Western Mining court suggested that they are distinct.  The court offered the example of a plaintiff who was injured by a state court judgment and who brings a federal action seeking a declaration that the applicable state statute is unconstitutional  as an illustration of a "state court loser" who is not seeking appellate review of the state court decision because the relief such a plaintiff seeks in federal court would not affect the existing judgment entered against him.  Id. at 168-69.  This example provided by the court demonstrates that the nature of the relief requested by the federal plaintiff may be critical in the court's evaluation of the second and fourth requirements under the Rooker-Feldman test set forth in Great Western Mining.  Accord Randall, 358 B.R. at 155-56 ("the relief sought (as opposed to the issues raised ) by the federal plaintiff will be particularly significant in determining whether the Rooker- Feldman doctrine applies") (quoting Daniel R. Coquillette, et al., 18 Moore's Federal Practice, ¶133.30[3][c] at 133-30.11 (3d ed. 2006)).

Finally, it is important to place the Rooker-Feldman doctrine in context.  The doctrine involves only a threshold decision regarding the court's subject matter jurisdiction.  If the court determines that the Rooker-Feldman doctrine does not apply, and that it has jurisdiction, it may then consider whether the plaintiff's claims are barred by the related doctrines of claim

---

[10]      Another species of federal action that is related to a state court action involve matters that are being simultaneously litigated in both fora.  Such a federal action is not barred by Rooker-Feldman.

12

preclusion or issue preclusion.  Great Western Mining, 615 F.3d at 170 (citing Exxon Mobil, 544

U.S. at 293).  The determination that the court has subject matter jurisdiction may only be a short

reprieve for the plaintiff and a segue by the court to a decision, on the merits, that the federal

claim is barred by either claim or issue preclusion.  E.g., Turner v. Crawford Square Apartments,

449 F.3d at 543-44; see also Easley v. New Century Mortg. Corp., 2010 WL 3622511, at *3 (3d

Cir. Sept. 20, 2010) (nonprecedential).

With these principles in mind, I consider whether this court has subject matter

jurisdiction over the claims of each Plaintiff.


**B.**

Resolution of the Rooker-Feldman issue as to Green Goblin is simple.  No prior

judgment was entered against Green Goblin.  Therefore, the Rooker-Feldman doctrine is

inapplicable to Green Goblin's claims.

Even in the absence of a judgment against Green Goblin, Simons contends that Green

Goblin should be considered a "state court loser for Rooker-Feldman purposes."  (Defendant's

Memorandum of Law on the Issue of Subject-Matter Jurisdiction at 8).  Simons relies on the

Second Circuit's decision in Hoblock, in which the court stated: "While . . .  claim and issue

preclusion are distinct from the Rooker-Feldman doctrine . . .  federal case law governing the

application of preclusion doctrines to nonparties should guide the analogous inquiry in the

Rooker-Feldman context."  Hoblock, 422 F.3d at 90.  Simon then argues that Sabertooth and

Green Goblin are sufficiently "closely aligned," see id. at 91, as to put them in privity for

purposes of preclusion and Rooker-Feldman.

Simons' reliance on Hoblock is misplaced in light of the Supreme Court's decision in

Lance v. Dennis, which was subsequent to Hoblock.  In Lance, the Court held Rooker-Feldman

inapplicable to a federal plaintiff who was not a party in the underlying state-court proceeding.

Lance, 546 U.S. at 466. The Court rejected the expansion of Rooker-Feldman to federal

plaintiffs who were not parties to the prior litigation, observing that, "[w]hatever the impact of

privity principles on preclusion rules, Rooker-Feldman is not simply preclusion by another

name." Id.


## C.

Sabertooth argues that Rooker-Feldman is inapplicable to its claim and makes several

related arguments in support of its position.  Because its Petition to Open was pending in the

State Court when the adversary proceeding was commenced, Sabertooth denies that it is a state

court "loser."  Instead, Sabertooth depicts the state and federal proceedings as "parallel

litigation."  (Plaintiffs' Memorandum of Law on the Issue of Subject-Matter Jurisdiction at 9).

Sabertooth asserts that the injury it seeks to redress is not the result of the entry of judgment, but

rather, arises from the post-judgment execution proceedings Simons initiated.[11]  And, Sabertooth

argues that this adversary proceeding does not require the bankruptcy court to review the merits

of the state court judgment.

---

[11]        Green Goblin describes the injury allegedly caused by Simons in their response to
Simons' Motion for Partial Summary Judgment on the Issue of Damages at 13-15 (Adv. No. 09-67, Doc #
135).  Succinctly put, Green Goblin asserts that Simons' actions caused existing members of the gym
operated by Green Goblin to cancel their memberships, impeded Green Goblin's ability to attract new
members, compromised the gym's revenue stream and ultimately caused the gym to close.  For its part,
Sabertooth apparently contends that Simons' actions caused Sabertooth to lose a valued tenant at the
Property.

14

**1.**

As a starting point, it is settled that the Rooker-Feldman doctrine applies to all judgments by a state court, including default judgments and judgments by confession.  This principle derives from the more general precept that state court default judgments and confessed judgments are treated by federal courts as judgments on the merits.  See, e.g., Calabria, 418 B.R. at 866 (default judgments); Stoss v. Singer Financial Corp., 2010 WL 678115, at *3 (E.D. Pa. Feb. 24, 2010); see also In re James, 940 F.2d 46, 52-53 (3d Cir. 1991).

Sabertooth seeks to distinguish those cases in which the Rooker-Feldman doctrine has been applied to confessed judgments as involving federal actions filed after the federal plaintiff's petition to open or strike the prior judgment already had been decided against the plaintiff by the State Court.  (See Plaintiffs' Memorandum of Law on the Issue of Subject-Matter Jurisdiction at 8, citing Stivala, 394 B.R. 778).  Here, by comparison, the Petition to Open was pending (albeit stayed by the bankruptcy filing),[12] when the adversary proceeding was commenced.[13]

---

[12]     See St. Croix Condominium, 682 F.2d at 449:

> [S]ection 362 should be read to stay all appeals in proceedings that were originally brought against the debtor, regardless of whether the debtor is the appellant or appellee. Thus, whether a case is subject to the automatic stay must be determined at its inception. That determination should not change depending on the particular stage of the litigation at which the filing of the petition in bankruptcy occurs.

[13]     Sabertooth also cites several cases in which no petition to open or strike was filed by the federal plaintiff before initiating the federal action and asserts that they are distinguishable on that basis from this proceeding.  See Flannery v. Mid Penn Bank, 2008 WL 5113437, at *4 (M.D. Pa. Dec. 3, 2008); Newton v. First Union Nat'l Bank, 316 F. Supp. 2d 225, 234 (E.D. Pa. 2004).  In Flannery and Newton, the courts concluded that, absent a petition to open or strike, nothing was "actually litigated," requiring the courts to determine the Rooker-Feldman outcome based solely on whether the federal claims were "inextricably intertwined" with the prior state court judgment.  After the Court of Appeals' decision

(continued...)

In support of its argument that the pendency of the Petition to Open is material for

Rooker-Feldman purposes, Sabertooth cites Geiger v. Foley Hoag LLP Retirement Plan, 521

F.3d 60 (1st Cir. 2008).  In Geiger, the court held the pendency of an appeal of a state court

judgment that was the basis of the Rooker-Feldman concern mandated that the state and federal

cases be characterized as "parallel litigation," not encompassed by Rooker-Feldman:

> [H]ad [the federal plaintiff's] appeal of the [state court] judgment been successful,
> the orders [determining the issues raised in the federal litigation] could have been
> overturned. Thus, it is not at all clear to us that the state court proceedings
> . . . had ended prior to [the plaintiff's] commencement of the federal suit.
> Accordingly, we do not rely on the district court's Rooker-Feldman rationale.

521 F.3d at 66.

Thus, Sabertooth's argument necessarily is that Geiger was correctly decided and that the

pendency of Sabertooth's timely-filed petition to open a confessed judgment[14] is the functional

equivalent of a pending appeal of an adverse state court judgment for Rooker-Feldman purposes.

While Sabertooth's position is not unreasonable, I am not persuaded that Geiger was correctly

decided.

Certainly, the initiation of a federal action during the pendency of a petition to open or

---

[13](...continued)
in Great Western Mining, this analytic framework lacks precedential value in this Circuit.  See Part III.A.,
supra.

In a nonprecedential, post-Great Western Mining decision involving a federal plaintiff
who did not move to open a default judgment held by the federal defendant, a panel of the Court of
Appeals analyzed the issues differently than the Flannery and Newton courts, finding some claims barred
under Rooker-Feldman and others not.  See Easley, 2010 WL 3622511, at *2.  Perhaps not surprisingly,
though, the Easley court held that all of the claims that survived Rooker-Feldman were properly
dismissed under the res judicata doctrine. (i.e., claim preclusion).  Easley, 2010 WL 3622511, at *3.

[14]      Sabertooth's Petition to Open, filed twenty-eight days after the entry of the confessed
judgment, appears to have been timely filed.  See Pa. R. Civ. P. 2959(a)(3); ESB Bank v. McDade,
2 A.3d 1236, 1240 (Pa. Super. 2010).

strike a state court judgment by confession appears to have some of the characteristics of parallel

litigation.  The unique nature of confessed judgments must be kept in mind – i.e., the entry of a

valid, binding court judgment against a defendant prior to any hearing on the merits, subject only

to the defendant's right to request that the judgment be open or struck to permit consideration of

the claims and defenses on their merits.  One might characterize confession of judgment civil

practice as simply reversing the ordinary burdens of civil litigation, shifting the burden of going

forward from the plaintiff to the defendant.[15]  Viewed in this light, from the perspective of a

defendant who timely files a petition to open or strike a confessed judgment, the state court

litigation is ongoing and viable until a final, non-appealable order is entered denying the petition

to open or strike the judgment.  Subjectively, the confessed judgment-defendant may feel, with

some justification, that so long as a petition to open judgment has not been decided by the state

court, the federal court is not reviewing a decision of the state court because no litigation on the

merits preceded the entry of the state court judgment.

Sabertooth's argument, however, overlooks the significance of the entry of the judgment.

The existence of a prior state court judgment distinguishes this case from the classic situation of

"parallel litigation" described in Exxon Mobil.  The pendency of a direct attack on a state court

when federal litigation is initiated does not change the fact that the federal litigation constitutes a

---

[15]     In deciding whether to grant a petition to open judgment, Pennsylvania courts consider
whether the petition : (1) was filed timely; (2) alleges a meritorious defense and (3) presents sufficient
evidence of that defense to require submission of the issues to the jury.  E.g., First Seneca Bank & Trust
Co. v. Laurel Mountain Development Corp., 485 A.2d 1086, 1088 (Pa. 1984).  In evaluating the
defendant's defenses, the court views the evidence in the light most favorable to the defendant and
accepts as true all evidence and proper inferences therefrom supporting the defense, while rejecting
adverse allegations of the party obtaining the judgment.  See Pa. R. Civ. P. 2959(e); Dollar Bank, Federal
Sav. Bank v. Northwood Cheese Co., Inc., 637 A.2d 309, 311 (Pa. Super. Ct.), appeal denied, 653 A.2d
1231 (Pa. 1994).

collateral attack on the state court judgment.  For a federal court to disregard the existence of the judgment entered before the initiation of the federal suit, simply because procedural avenues remain open in state court for modification of the judgment, would be the quintessential, forbidden act under <u>Rooker-Feldman</u> – exercising appellate review of a valid state court judgment.  And, as the Supreme Court stated in <u>Exxon Mobil</u>, 544 U.S. at 283-84, complaints that invite "federal courts of [the] first instance to review and reverse unfavorable state-court judgments" are "out of bounds."  <u>See also</u> 28 U.S.C. §1738 (state "judicial proceedings  .  .  . shall have the same full faith and credit in every court within the United States  .  .  . as they have by law or usage in the courts of such State ").  So long as the federal plaintiff effectively seeks to negate the force of the judgment, it is not possible for the federal court to exercise jurisdiction without exercising appellate review of the validity of the state court judgment.  At bottom, that a direct attack on the state court judgment in the form of a petition to open judgment is pending at the time that a collateral attack on the judgment is initiated in federal court does not make the collateral attack any less of a collateral attack.

Therefore, notwithstanding the First Circuit's decision in <u>Geiger</u>, if a state court judgment remains undisturbed when a federal action is initiated, the simpler, better and correct rule of decision in the <u>Rooker-Feldman</u> context is that a federal court must honor the state court judgment, at least until direct attack on the judgment succeeds.  In short, if an adverse judgment is in place when a party initiates a federal action, the federal plaintiff is a state court "loser" and the federal action is not "parallel litigation."[16]

---

[16]     Obviously, <u>Geiger</u>, a decision from another Circuit, is not binding on this court.  In my research, I could not locate any binding decision squarely on point.  However, I find some support for my conclusion in the recent, nonprecedential decision of our Court of Appeals in <u>Laychock v. Wells Fargo</u>

(continued...)

**2.**

Having concluded that Sabertooth is a state court "loser" for <u>Rooker-Feldman</u> purposes

(element one of the <u>Great Western Mining</u> test), I next consider element two of the test, whether

Sabertooth complains of injuries caused by the state court judgment.

Sabertooth argues that the injury it seeks to redress stems from the post-judgment

execution proceedings, not from the entry of judgment itself.  Sabertooth downplays the role the

judgment played in causing its alleged injuries, arguing that "Simons' act of directing the Sheriff

to execute on his judgment was a separate event in furtherance of his contractual breach."

(Plaintiffs' Memorandum of Law on the Issue of Subject-Matter Jurisdiction at 18).  Sabertooth

seeks support in cases, including <u>Great Western Mining</u>, which hold that so long as the source of

---

[16](...continued)
<u>Home Mortg.</u>, 2010 WL 4284525 (3d Cir. Nov. 1, 2010).

The history in <u>Laychock</u> was similar in certain respects to the procedural posture in the present proceeding.  In <u>Laychock</u>, the federal plaintiff suffered the entry of a default judgment against her in an action in mortgage foreclosure in state court.  Prior to filing a federal action, she filed a petition to open judgment.  In the federal action, the plaintiff asserted, <u>inter alia</u>, a claim under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. C.S. §§201-1 to 201-9.3 ("the UTPCPL").  The UTPCPL claim included, <u>inter alia</u>, a legal theory of "wrongful foreclosure."  While the federal action was pending, the state court denied the petition to open judgment.  The district court later dismissed the action.  The Court of Appeals affirmed, holding that the "wrongful foreclosure" claim was barred by <u>Rooker-Feldman</u> and the other claims were barred by <u>res judicata</u>.  2010 WL 4284525, at *2.  With respect to the wrongful foreclosure claim, the court found that all four elements of the <u>Great Western Mining</u> test were met and concluded that "relief from a 'wrongful foreclosure' requested by Laychock would have required the District Court to determine that the state court erroneously entered judgment."  <u>Id.</u>

<u>Laychock</u> is certainly consistent with the result I have reached in this proceeding regarding the inapplicability of the "parallel litigation" doctrine.  Notwithstanding the pendency of a petition to open the state court judgment at the time the federal action was filed, in <u>Laychock</u>, the court applied the <u>Rooker-Feldman</u> doctrine without any concern that the federal action involved "parallel litigation."   Still, I do not wish to overstate the significance of the nonprecedential decision.  There is no suggestion in the court's opinion that the federal plaintiff raised or the court considered the argument raised here by Sabertooth.

the injury in the federal action "is the defendant's actions (and not the state court judgments), the

federal suit is independent, even if it asks the federal court to deny a legal conclusion reached by

the state court." Great Western Mining, 615 F.3d at 167.

I am unpersuaded by this argument.

The "guidepost" provided in Great Western Mining, i.e., whether the injury complained

of existed prior to the state court proceedings (thus cutting off any causal relationship between

the injury and the judgment), is helpful in revealing the fallacy in Sabertooth's argument.

It is undisputed that Sabertooth's injury did not precede Simons' initiation of the state

court proceedings.  The alleged injury arose because the state court judgment was entered, a

judgment that Sabertooth complains vociferously should not have been entered because Simons

was not entitled to the relief he requested under the applicable contract.  The right to initiation

execution proceedings arose only after the entry of that judgment.  Indeed, it is not unreasonable

to conceptualize the execution proceedings as a mere extension of the entry of the judgment,

their very purpose being to enforce the judgment. Given this relationship between the judgment

and the execution proceedings, the causal connection between Simons' allegedly wrongful entry

of judgment by confession and the asserted economic injury suffered by Sabertooth is concrete

and direct. This creates the Rooker-Feldman nexus between the judgment and Sabertooth's

claim.

Stated somewhat differently, the asserted contractual breach (i.e., the asserted legal

injury) was Simons' act of confessing judgment.  The execution proceedings were merely a

continuation of the allegedly wrongful act.  While Simons' execution proceedings in

enforcement of the judgment caused consequential damages in the form of economic injury, see

n.11, supra, the gravamen of Sabertooth's complaint is that the judgment should not have been entered. Therefore, the injury that Sabertooth complains of is the entry of the judgment in breach of Simons' contractual duties, not wrongful execution on the judgment.

Perhaps if Sabertooth alleged that Simons committed some independent wrongful act after the entry of judgment that resulted in wrongful execution proceedings, the nexus between the judgment and Sabertooth's claim would be severed. However, he did not. At no time in this proceeding has Sabertooth made any claim that the execution proceedings were defective for any reason other than that they were based on an erroneously entered judgment. In these circumstances, I cannot accept Sabertooth's argument that its injury does not stem from the judgment.

The absence of any allegation that the execution on the judgment involved some "wrongful" conduct independent of the entry of an erroneous judgment distinguishes this proceeding from each case cited by Sabertooth in support of its argument.[17] In every case referenced in n.17, supra, the asserted injury derived from the violation of some legal right other than the "correctness" of the judgment and therefore, the claim was not barred by Rooker-

---

[17]    See Todd v. Weltman, Weinberg & Reis Co., L.P.A., 434 F.3d 432, 437 (6th Cir. 2006) (claim that state court judgment was based on false affidavit submitted in violation of federal Fair Debt Collection Practices Act did not complain of injuries caused by judgment and was independent of the judgment); Bolden v. City of Topeka, 441 F.3d 1129, 1143 (10th Cir. 2006) (damage claims that city's destruction of federal plaintiff's buildings was wrongful under federal civil rights laws was independent of plaintiff's unsuccessful state court attempt to enjoin their destruction); Brokaw v. Weaver, 305 F.3d 660, 665 (7th Cir. 2002) (damages claim for conspiracy based on defendants' allegedly false reports of child neglect resulting in child's removal from her parent's home was claim for injuries based on conspiracy, not on judgment in child neglect proceeding); Nesses v. Shepard, 68 F.3d 1003, 1004-05 (7th Cir. 1995) (federal claim that lawyers and judges participating in litigation resulting in adverse state court judgment engaged in conspiracy to deprive plaintiff of his right to impartial tribunal was injury independent of that caused by state court judgment).

Feldman.

Indeed, before the Rooker-Feldman issue was brought to its attention, Sabertooth

implicitly conceded that the injury it suffered was based on the state court judgment.  In

contesting Simon's Motion for Partial Summary Judgment on the Issue of Damages, Sabertooth

argued:

> As a result of the Defendant's act of confessing judgment and directing the
> Sheriff of Montgomery County, PA to post a "For Sale" sign on and in front of
> the Gold's Gym that the number of prospective members declined, the number of
> new members declined and the number of member cancellations increased, which
> caused Plaintiffs to cease operation.

(Plaintiffs' Response to Defendant's Motion for Partial Summary Judgment on the Issue of

Damages at 14 (emphasis added)).  In the same memorandum, the Plaintiffs framed the first

issue for the court as follows:

> Should Debtors be permitted to seek damages for the lost value to its business
> where Defendants act of confessing judgment and directing the Sheriff of
> Montgomery County, Pennsylvania to schedule and post a "For Sale" sign in
> front of and on the King of Prussia Gold's Gym since the evidence shows
> precipitous declining membership as a natural, ordinary, and reasonably
> foreseeable result of the breach?

(Plaintiffs' Response to Defendant's Motion for Partial Summary Judgment on the Issue of

Damages at 17 (emphasis added)).

I recognize that one passage of Sabertooth's Memorandum might be read to contend that

Simons engaged in wrongful conduct that caused Sabertooth injury independent of the entry of

an erroneous judgment.  Sabertooth asserts that Simons "misrepresented to the Montgomery

County Court of Common Pleas that a confessed judgment should be entered, when he, and his

lawyer, knew that he may not be due anything at all."  (Plaintiffs' Memorandum of Law on the

Issue of Subject-Matter Jurisdiction at 20).  This attempt to divorce Sabertooth's injury from the

22

judgment might have more force if Sabertooth had asserted some type of tort claim (such as

malicious prosecution or abuse of process).  However, the Amended Complaint sounds solely in

breach of contract.  Under the contract theory set forth in its pleading, Simons' state of mind in

taking the actions alleged to have breached the parties' contract is irrelevant.  Sabertooth's claim

is not that it is entitled to relief because Simons acted with some type of wrongful, actionable

intent; the claim is simply that his conduct breached the parties' contract.  Sabertooth's effort to

avoid application of the <u>Rooker-Feldman</u> doctrine by suggesting that its injury is traceable not

only to Simons' alleged breach of contract (the same contract on which his judgment against

Sabertooth is based) but also to some separate, wrongful, tortious conduct falls outside the

pleadings.  Therefore, it must be rejected.


### 3.

Finally, I consider the fourth element of the <u>Great Western Mining</u> test and conclude that

Sabertooth is seeking federal court review of the merits of the judgment.

Sabertooth acknowledges that its position is that "the state court judgment was wrong,"

but contends that it is claiming so only "indirectly . . . only because Simons breached his

contract." (Plaintiffs' Memorandum of Law on the Issue of Subject-Matter Jurisdiction at 20).  I

fail to grasp any distinction that is material for <u>Rooker-Feldman</u> purposes.

Sabertooth's claim in this proceeding is that Simons violated his obligations under the

Proietto-Sabertooth Note and the Sabertooth Mortgage by confessing judgment against

Sabertooth when no default had arisen or, alternatively, when the contracts otherwise prohibited

all collection action.  The contract that Sabertooth claims was breached is the same contract on

which Simons' confessed judgment is based.  The confessed judgment necessarily was based on

Sabertooth's "default . . . on a valid and enforceable note."  Newton, 316 F. Supp. 2d at 235

(quoting Zhang v. Haven-Scott Assoc., Inc., 1996 WL 355344, at *8 (E.D. Pa. June 21, 1996);

accord Flannery, 2008 WL 5113437, at *5.  In these circumstances, it is logically impossible for

the bankruptcy court to grant Sabertooth the relief it seeks without reviewing the merits of the

state court judgment and without negating it by concluding that it was Simons was not entitled to

the remedy granted him by the state court.

In my view, this proceeding does not fall within the ambit of proceedings in which

Sabertooth's "entitlement to such damages could be assessed without any analysis of the

state-court judgment[]."  Great Western Mining, 615 F.3d at 173.  This proceeding differs from

Great Western Mining, where the plaintiff's distinct due process claim could be adjudicated

without reviewing and negating the state court judgment in which the court declined to set aside

the adverse arbitration award.  See n.9, supra.  By comparison, Sabertooth can succeed in this

proceeding only if I examine the same contract on which Simons' judgment is based and

conclude that the state court judgment was entered erroneously because Simons lacked the

authority to confess judgment. Thus, this is a case in which Sabertooth asks this court to reject

and overrule the state court judgment.  See Diehl v. Connell, 382 Fed. Appx. 127, 129 (3d Cir.

2010) (nonprecedential) (applying Rooker-Feldman doctrine where "to grant relief . . . [court]

would be required to find that the state court judgment is erroneous, or at least render that

judgment ineffectual").

That Sabertooth requests the bankruptcy court review and overrule the state court

judgment also is revealed by the relief Sabertooth seeks in this court.  Sabertooth requests not

24

only monetary damages for breach of contract, but also disallowance of Simons' proof of claim.

(See Plaintiff's Motion for Partial Summary Judgment at ¶ 40.)  The request that the claim be

disallowed is not based on any independent legal theory, but simply because Sabertooth asserts

that the judgment is erroneous.

For these reasons, Sabertooth's claims will be dismissed for lack of subject matter

jurisdiction.  Remaining before the court are Green Goblin's and Simons' respective Motions for

Partial Summary Judgment on the Issue of Liability and Simons' Motion for Partial Summary

Judgment on the Issue of Damages.

## IV.  LEGAL STANDARDS GOVERNING SUMMARY JUDGMENT UNDER RULE 56

A motion for summary judgment is governed by Fed. R. Civ. P. 56 (incorporated in this

proceeding by Fed. R. Civ. P. 7056).  Last year, in In re Coley, 433 B.R. 476 (Bankr. E.D. Pa.

2010), I summarized the legal standards applicable to a motion for summary judgment:

> The standard for evaluating a summary judgment motion is well established
> . . . .  Pursuant to Fed. R. Civ. P. 56(c), summary judgment should be granted
> when the "pleadings, the discovery and disclosure materials on file, and any
> affidavits show that there is no genuine issue as to any material fact and that the
> movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).
>
> Before a motion for summary judgment may be granted, the court must find
> that the motion alleges facts that, if proven at trial, would require a directed
> verdict in favor of the movant.  See Fitzpatrick v. City of Atlanta, 2 F.3d 1112,
> 1115 (11th Cir. 1993).  If the movant meets this initial burden, the responding
> party may not rest on his or her pleadings, but must designate specific factual
> averments through the use of affidavits or other permissible evidentiary material
> that demonstrate a triable factual dispute.  Celotex Corp. v. Catrett, 477 U.S. 317,
> 324 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-50 (1986).  Such
> evidence must be sufficient to support a factfinder's factual determination in favor
> of the nonmoving party.  Anderson, 477 U.S. at 250.  Evidence that merely raises

some metaphysical doubt regarding the validity of a material facts is insufficient. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In considering the evidentiary matter submitted in support of and in opposition to a summary judgment motion, the court's role is not to weigh the evidence, but only to determine whether there is a disputed, material fact for determination at trial. Anderson, 477 U.S. at 247-50. A dispute about a "material" fact is "genuine" only if the evidence is such that a reasonable factfinder could return a verdict for the non-moving party. Id. at 248. All reasonable inferences must be drawn in favor of the nonmoving party and against the movant. U.S. v. 717 S. Woodward St., 2 F.3d 529, 533 (3d Cir. 1993).

The parties' respective burdens of proof also play a role in determining the merits of a summary judgment motion.

> [W]here the movant is the defendant, or the party without the burden of proof on the underlying claim, the movant still has the initial burden of showing the court the absence of a genuine issue of material fact, but . . . this does not require the movant to support the motion with affidavits or other materials that negated the opponent's claim. In contrast, where . . . "the party moving for summary judgment is the plaintiff, or the party who bears the burden of proof at trial, the standard is more stringent." National State Bank v. Federal Reserve Bank, 979 F.2d 1579, 1582 (3d Cir.1992).

In re Newman,304 B.R. 188, 193 (Bankr. E.D. Pa. 2002) (quoting Adams v. Consol. Rail Corp., 1994 WL 383633, *1-*2 (E.D. Pa. July 22, 1994)).

Coley, 433 B.R. at 485-86 (footnote omitted).

Thus, for Green Goblin to prevail on its Motion, it must demonstrate that material facts are not in dispute and there is an absence of evidence to create a triable issue regarding every necessary element of its claims. For Simons to prevail on his motion, he need only demonstrate that Green Goblin has failed to meet its burden with respect to any element of its claim.

## V.  THE PARTIES' CONTENTIONS

In its Memorandum of Law in Support of the Motion for Partial Summary Judgment, Green Goblin advances three, distinct breach of contract theories.

26

## A.

Green Goblin's first theory is that Simons breached the terms of the Proietto Notes by confessing judgment against Sabertooth when Sabertooth was not in default because the conditions precedent to its payment obligation on the Proietto-Sabertooth Note had not yet occurred.

The Proietto Notes did not require any repayment to the Proiettos for the first two years. After two years, payment of principal and interest was required only if Green Goblin showed on a consolidated basis two years of 1.25:1 cash flow/debt service coverage as defined under generally accepted accounting principles. Green Goblin contends that the obligation to make any payments on the Proietto Notes never arose because it never achieved the "cash flow/debt service ratio" which was a condition precedent to repayment. Consequently, Green Goblin argues that no default occurred and that Simons' exercise of the confession of judgment was wrongful and a breach of his obligations under the Proietto Notes.

In response, Simons argues that this theory is flawed because it ignores the maturation provision in the first paragraph of the Proietto Notes (i.e., "with a final payment of all then outstanding principal and all unpaid and accrued interest due and payable on the sixty month anniversary"). Simons concedes that no payments were required for the first five years unless "the cash flow/debt service coverage ratio" condition was met. (Defendant's Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment at 13). However, he points out that the Proietto Notes matured after five years, with all principal and interest falling

27

due at that time.[18]  Simons contends that  the "cash flow/debt service ratio" condition  must be

read in harmony with the maturation provision and that neither provision supersedes the other.

He suggests that his interpretation (i.e., that the cash flow/debt service ration condition

terminated upon maturation of the Notes) is the only reasonable interpretation because: (1) it is

the only way to give effect to all the provisions under the Proietto Notes and (2) Green Goblin's

suggested interpretation could allow the Plaintiffs to avoid repayment indefinitely (or even

forever) which, Simons argues, could not have been intended by the parties.  In Simons' view,

Green Goblin was in default due to its failure to pay off the Proietto Notes after they matured,

thus entitling him to file the confession of judgment.


## B.

Green Goblin's second theory is that even if Sabertooth was in default of the Note,

Simons breached his contractual obligations because the Note incorporated Paragraphs 3 and 4

of the Sabertooth Standby Agreement, which required the Proiettos (and Simons as assignee) to

forbear from any collection activity on the Proietto Notes and the Sabertooth Mortgage until the

BLC obligation was paid in full or BLC gave its consent.  Green Goblin reads the Proietto Notes

to fully incorporate all of the provisions of the Standby Agreements, including Paragraphs 3 and

4 of the Standby Agreements. Thus, according to Green Goblin, filing the confession of

judgment was a breach of the provisions of the Standby Agreements that were incorporated into

---

[18]        There is no dispute that Simons waited until after the five year maturation date before he
confessed judgment against Sabertooth.

the Proietto Notes.[19]

In response, Simons disputes that the Proietto Notes incorporate the critical provisions of the Standby Agreements.  He points out that while the Proietto Notes make a general reference to the Standby Agreements ("In accordance with a certain Standby Creditors Agreement"), the Proietto Notes do not expressly incorporate all of its provisions.  Rather, the Notes paraphrase Paragraph 1 but do not quote, paraphrase or refer in any way to Paragraphs 3, 4, or 7 of the Standby Agreements.  Based on their text, Simons contends that the Proietto Notes incorporated the two year deferral of repayment and the "cash flow/debt service ratio" conditions of the Standby Agreements, but nothing more.  Without incorporation of Paragraphs 3 and 4 of the Standby Agreements, Simons reasons that he could not have been in breach of any provisions of the Proietto Notes.[20]

---

[19]    Implicit in both of Green Goblin's first two legal theories is an assumption that Simons breached the Proietto-Green Goblin Note by wrongfully enforcing his rights against Sabertooth.  This assumption is discussed further in Part VI.A., infra.

These two legal theories also assume that the contractual provisions in the Proietto Notes that deferred  Sabertooth's and Green Goblin's repayment obligation and that allegedly restricted Proietto's (and Simons') right to exercise legal remedies upon default are not merely conditions which may provide defenses in a legal action to enforce the Notes, but are contractual promises whose breach give rise to an affirmative claim.  There is authority for the Plaintiffs' position.  E.g. In re Clemens, 197 B.R. 779 (Bankr. M.D. Pa. 1996).  I do not reach that issue.

[20]    In Defendant's Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment, Simons also asserts that even if he were subject to the Standby Agreements, through incorporation into the Proietto Notes or otherwise, he is a holder in due course of a negotiable instrument and "he would not be subject to any conditions to recovering any payment under the [Proietto] Notes of which he had no notice."  (Defendant's Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment at 16).

Assuming arguendo that the holder in due course doctrine is implicated here, the party asserting a right to payment and claiming holder in due course status must be a holder of a negotiable

(continued...)

## C.

Green Goblin's third theory posits that Simons is liable to Green Goblin as a third party

beneficiary of the Sabertooth Standby Agreement because Simons breached Paragraphs 3 and 4

the Standby Agreements by confessing judgment against Sabertoot before BLC had been paid in

full and without BLC's consent.  In support of this contention, Green Goblin argues it is a third-

party beneficiary under the Standby Agreements because the Proietto Notes cross referenced the

Standby Agreements. [21]

---

[20](...continued)
instrument.  See 13 Pa. C.S. § 3302.  A "negotiable instrument" is an "unconditional promise or order to
pay a fixed amount of money, with or without interest or other charges described in the promise or order,
if it: (1) is payable to bearer or to order at the time it is issued or first comes into possession of a holder;
(2) is payable on demand or at a definite time; and (3) does not state any other undertaking or instruction
by the person promising or ordering payment to do any act in addition to the payment of money."  13 Pa.
C.S. §3104(a).  An unconditional promise or order is "unconditional unless it states: (1) an express
condition to payment; (2) that the promise or order is subject to or governed by another writing; or (3)
that rights or obligations with respect to the promise or order are stated in another writing.  A reference to
another writing does not of itself make the promise or order conditional."  13 Pa. C.S. §3106(a) (1)-(3).

Several references to other loan documents in the Proietto Notes regarding the makers
obligations under the Notes serve to destroy negotiability.  See 13 Pa. C.S §3106(a)(3).  For example, in
Paragraph 2 of the Green Goblin-Proietto Note, it states: "When principal and interest payments are
permitted to be made under the Standby Agreement . . . ."  Paragraph 6 states: "If Makers fail to observe
or perform any of the agreements or covenants contained in the Mortgage . . . ."  Paragraph 7 states:
"Maker shall be in default hereunder upon the occurrence of either of the following  . . .  (b) A default
under the Mortgage which is not corrected within the applicable period therein specified."

I conclude that the Proietto Notes are not negotiable instruments because they are subject
to other rights and obligations which are stated in other loan documents, making the Proietto Notes
conditional.  See, e.g., Federal Deposit Ins. Corp. v. Parkway Executive Office Center, 1997 WL 535164,
*17 (E.D. Pa. Aug, 18, 1997).

[21]      I note that a considerable portion of the Plaintiff's Motion is devoted to a recitation of
statements made by Simons during his Rule 2004 Examination.  Specifically, Simons testified that he
believed himself to be subject to and bound by the Standby Agreements; he acknowledged that the
Plaintiffs had not reached the required "cash flow/debt service ratio" condition for repayment, and that he
breached the Standby Agreements by wrongfully confessing judgment.  Predictably, Simons objects to
the use of this testimony arguing, inter alia, that many of his statements were taken out of context and

(continued...)

Simons disputes that Green Goblin has any rights under the Standby Agreements, asserting that Green Goblin was neither a direct party nor a third-party beneficiary of the Agreements.[22]  In effect, he contends that even if he violated Paragraphs 3 and 4 of the Standby Agreements, only BLC holds a claim for breach of contract (and BLC has not asserted such a claim).

## VI.  DISCUSSION

### A.

As a threshold matter, it is necessary to identify an issue that comes into focus upon considering the consequences of the dismissal of Sabertooth's claim for lack of subject matter jurisdiction.

Sabertooth's dismissal from this proceeding leaves Green Goblin's breach of contract claim as the sole claim before the court.  The conduct asserted to give rise to the breach of contract claim was Simons' entry of a confessed judgment and the commencement of execution proceedings <u>against Sabertooth</u>.  Simons took no legal action against Green Goblin.

The obvious question that comes to mind is:

_____

[21](...continued)
admissions regarding statements of law are not binding on a non-lawyer.  I decide  the pending Motions on grounds that do not require that I resolve these disputes regarding the use and significance of Simons' Rule 2004 testimony.


[22]        Simons makes the related argument that Green Goblin lacks standing to enforce the Standby Agreements.  He also disputes that he was subject to the Standby Agreements because they were not expressly assigned to him.  He denies that he had notice of their provisions (except to the extent that they were included in the Proietto Notes) and maintains that he never agreed to be bound by them.  This is another issue that it is unnecessary to decide at this time.

> ***How is a contract between Simons (as assignee of the Proiettos) and Green Goblin[23] breached by Simons' exercise of remedies under different contracts (the Proietto-Sabertooth Note and the Sabertooth Mortgage) against a different party (Sabertooth)?***

For Green Goblin's claim to be viable, there are only two possible answers to the question.  Either: (1) the Proiettos and Green Goblin intended to incorporate the limitations on Simons' rights and remedies found in the Sabertooth Note and/or the Sabertooth Standby Agreement into the Proietto-Green Goblin Note or (2) the Proiettos and BLC intended Green Goblin to be a third-party beneficiary of the Proietto-Sabertooth Standby Agreement.

Resolution of these issues necessarily requires interpretation of the provisions of the Proietto Notes and the Standby Agreements. To properly analyze these issues, it is helpful to review briefly the legal principles governing the interpretations of contracts under Pennsylvania law.[24]

## B.

### 1.

Under Pennsylvania law, to establish a claim for breach of contract, a plaintiff must prove (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages.  J. F. Walker Co. Inc. v. Excalibur Oil Group, Inc.,

---

[23]    It is undisputed that Simons derived his right to payment under the Proietto Notes and the Sabertooth Mortgage through an assignment.  As an assignee, Simons stands in the shoes of the assignor, but succeeds to no greater rights than those possessed by the assignor.  See Crawford Cent. Sch. Dist. v. Commonwealth, 585 Pa. 131, 137 (Pa. 2005).

[24]    The provisions of the Proietto Notes state that they "shall be governed and construed in accordance with the laws of the Commonwealth of Pennsylvania."

792 A.2d 1269, 1272 (Pa. Super. Ct. 2002)(quoting <u>Williams v. Nationwide Mut. Ins. Co.</u>, 750

A.2d 881, 884 (Pa. Super. Ct. 2000).

    Where, as here, there is a dispute regarding the meaning and terms of a contract, the

starting point is to review the writings that were prepared in connection with the transaction:

> Pennsylvania contract law begins with the firmly settled point that the intent of
> the parties to a written contract is contained in the writing itself.  Where the
> intention of the parties is clear, there is no need to resort to extrinsic aids or
> evidence, instead, the meaning of a clear and unequivocal written contract must
> be determined by its contents alone.

<u>Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc.</u>, 247 F.3d 79, 92-93 (3d Cir. 2001) (internal

quotations and citations omitted); <u>accord</u> <u>In re Bryant</u>, 323 B.R. 635, 639 (Bankr. E.D. Pa 2005).

    The principle that the meaning of a written contract is to be determined from the writing

itself without resort to extrinsic evidence is subject to two important qualifications.

    The first qualification, only alluded to in the quotation above from <u>Bohler-Uddeholm</u>, is

that the parties intend the writing to be the complete expression of their agreement (<u>i.e.</u>, the

contract is fully integrated in the writing).  The second qualification, expressly stated in

<u>Bohler-Uddeholm</u>, is that the writing is clear and unequivocal.

    Thus, if a contract is either <u>not fully integrated</u> in the writing executed by the parties or is

<u>ambiguous</u>, the court may consider extrinsic evidence in determining its terms and/or the

meaning of its terms.  <u>Claret Capital Nominees v. Benett</u>, 2010 WL 300288, at *3 (E.D. Pa. Jan.

25, 2010) (extrinsic evidence may be considered where party is seeking to add or clarify term of

contract); <u>Yocca v. Pittsburgh Steelers Sports, Inc.</u>, 854 A.2d 425 (Pa. 2004) ("where a term in

the parties' contract is ambiguous, 'parol evidence is admissible to explain or clarify or resolve

the ambiguity, irrespective of whether the ambiguity is created by the language of the instrument

or by extrinsic or collateral circumstances.'") (quoting <u>Estate of Herr</u>, 161 A.2d 32, 34 (Pa. 1960)).

Both of these qualifications come into play here. In this proceeding, Green Goblin is arguing that the Proietto-Green Goblin Note, standing alone, is not a fully integrated contract and that the Proiettos and Green Goblin supplemented its provisions by orally incorporating terms from the Sabertooth loan documents.[25] The parties also differ as to the clarity and meaning of the loan documents.

At the summary judgment stage, my task is to determine if there is a disputed issue of material fact. In light of the contentions of the parties, if a factual dispute exists as to whether the Proietto-Green Goblin Note was fully integrated, then a disputed issue of material fact exists and neither party is entitled to summary judgment.

**2.**

The <u>Restatement (Second) of Contracts</u> §§209-218 (West 2011) (the "Restatement") provides guidance in determining whether a contract is fully integrated.[26]

---

[25]    Green Goblin contends that all of the components of the real property and asset purchase, including all the agreements with all three lenders and the related guarantees, constituted a single "integrated transaction." (Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment at 2 (unpaginated)).

[26]    Pennsylvania courts have relied upon these provisions of the Restatement. <u>See, e.g.</u>, <u>McGuire v. Schneider, Inc.</u>, 534 A.2d 115, 117-118 (Pa. Super. Ct. 1987); <u>Daset Min. Corp. v. Industrial Fuels Corp.</u>, 473 A.2d 584, 592-93 (Pa. Super. Ct. 1984); <u>Olbum v. Old Home Manor, Inc.</u>, 459 A.2d 757, 761-62 (Pa. Super. Ct. 1983); <u>Textile Biocides, Inc. v. Avecia, Inc.</u>, 2001 WL 1855059, at *14 (Pa. Com. Pl. July 26, 2001); <u>see also</u> <u>Spatz v. Nascone</u>, 424 A.2d 929, 937 (Pa. Super. Ct. 1981) (noting that Pennsylvania courts have often relied on Restatement of (Second) Contracts for guidance in interpretation of contracts).

Restatement §209(3) states that a written agreement is fully integrated if "in view of its completeness and specificity [it] reasonably appears to be a complete agreement . . . unless it is established by other evidence that the writing did not constitute a final expression." An agreement is not completely integrated "if the writing omits a consistent additional agreed term which . . . in the circumstances might naturally be omitted from the writing." Id. §216(2). For example, if the parties to a written agreement "agree orally that performance of the agreement is subject to the occurrence of a stated condition, the agreement is not integrated with respect to the oral condition." Id. §217.

The determination whether there is an integrated agreement is made by the court as "a question preliminary to determination of a question of interpretation or to application of the parol evidence rule." Id. §209(2). The issue whether the agreement is integrated is a question of law. Lenzi v. Hahnemann Univ., 664 A.2d 1375, 1379 (Pa. Super. Ct. 1995). In determining whether the agreement is fully integrated, the court may consider extrinsic evidence. Restatement §214(b) & cmt. a; Rempel v. Nationwide Life Ins. Co., Inc., 370 A.2d 366, 371 (Pa. 1977) ("parol evidence rule is no bar to oral testimony designed to show that the writing is not an integrated writing"); accord Kohn v. Kohn, 364 A.2d 350, 353-54 (Pa. Super. Ct. 1976); see also Restatement §210 cmt. b. ("a writing cannot of itself prove its own completeness, and wide latitude must be allowed for inquiry into circumstances bearing on the intention of the parties").


## C.

Based primarily on consideration of the circumstances in which the parties entered into the various agreements, I conclude here that there is an issue of material fact whether the

Proietto-Green Goblin Note was fully integrated.  Specifically, there is a material issue of fact

whether the Proietto-Green Goblin Note's terms were supplemented by Paragraphs 3 and 4 of

the Sabertooth Standby Agreement.

The Proietto-Green Goblin Note was one, relatively modest, component of a multiparty

commercial transaction in which Green Goblin and Sabertooth, acting both as borrowers and

guarantors, and Venom, acting as a guarantor, obtained financing from three creditors for the

purpose of purchasing a business and the real estate on which the business was situated.  As a

condition of granting its loan,  BLC, the second position creditor on the real estate, insisted that

the remedies of the third position creditor, the Proiettos, be subordinated to BLC.  As a result,

the Proiettos entered into two Standby Agreements with BLC, one for the Proietto-Green Goblin

Note and the other for the Proietto-Sabertooth Note.  In the Standby Agreements, the Proiettos

accepted certain restrictions on their right to payment under the Proietto Notes and their right to

take legal action to enforce the Notes upon default.  The restriction on the Proiettos' right to

receive repayment was incorporated expressly in the Proietto-Green Goblin Note (i.e., the "cash

flow/debt service ratio" condition precedent to payment).  The restriction on the exercise of legal

remedis upon default was not (i.e., the Proiettos' promise found in Paragraphs 3 and 4 of the

Standby Agreements to take no action to enforce the Proietto-Sabertooth Note or the Sabertooth

Mortgage until BLC is paid in full).

In this context, I conclude that Green Goblin's factual assertion, that its agreement with

the Proiettos also included the restrictions found in Paragraphs 3 and 4 of the Sabertooth Standby

Agreement, potentially satisfies both parts of the test set forth in Restatement §216(2) for

determining whether a contract is not fully integrated (i.e., that it is (1) a consistent additional

36

term that (2) might naturally be omitted from the writing).

The asserted additional restriction does not contradict the Proietto-Green Goblin Note. The Proietto-Green Goblin Note already included one serious restriction on the repayment terms, derived from the Standby Agreements.  That the parties may have agreed to another restriction, not expressed in the writing, is supplementary, not contradictory.  See Restatement §217; The Cantamar, L.L.C. v. Champagne, 142 P.3d 140, 147-48 (Utah Ct. App. 2006) (reversing trial court's grant of summary judgment against borrower who contended that loan agreement was not fully integrated and that there was oral agreement that was not required to repay loans until borrower obtained $15 million investment in his business); Lyon v. Lyon, 675 N.Y.S.2d 896, 896-97 (N.Y.A.D. 2d Dept. 1998) (trial court "properly interpreted the mortgage and note by referring to the judgment of divorce and other documents"); New Eng. Educ. Training Serv., Inc. v. Silver St. Partnership, 595 A.2d 1341, 1344 (Vt. 1991) ("[S]pecial-purpose documents [such as notes] seldom embody a complete statement of the agreement between the parties . . . .  Thus, it was proper for the court to consider the purchase and sale agreement and its extensions, as well as the surrounding circumstances of the parties").

I also am satisfied, based on the nature of the transaction as a whole that the second restriction from the Standby Agreements simply may have been omitted from the Proietto-Green Goblin Note notwithstanding the parties' intent to include the provision.  It is not intuitive that the Proiettos would negotiate with Green Goblin and Sabertooth for the right to exercise their remedies in the Proietto Notes in circumstances that would breach their contract with and render them liable to BLC.  It seems more natural for the parties to have intended that all of the loan documents contain parallel restrictions.  Further, in light of the fact that Green Goblin and

Sabertooth were part of a single business enterprise (Sabertooth owning the land on which Green

Goblin operated the gym), Green Goblin had every incentive to make sure that Green Goblin and

Sabertooth had corresponding protections in their respective loan agreements with the

Proiettos.[27]

These circumstances convince me that the Proietto-Green Goblin Note may not have

been fully integrated and that there is a fact issue whether the parties intended to incorporate all

of the restrictions found in the Sabertooth Standby Agreement into the Proietto-Green Goblin

Note. Accord The Cantamar, L.L.C. v. Champagne, 142 P.3d at 147 ("despite the note appearing

to be facially integrated and the presumption of integration applied to such agreements" evidence

raised genuine issue of material fact as to whether parties assented to writing as final statement

of  intended agreement or executed it for some other purpose) (citing Union Bank v. Swenson,

707 P.2d 663, 666 (Utah 1985)); Ryder v. Williams, 558 N.E.2d 1134, 1136 (Mass. App. Ct.

1990) ("especially in view of the brevity and unusual form of the notes, could justify the judge's

finding that the parties' contract was not integrated").

In reaching this result, I acknowledge that the express incorporation into the Proietto

Notes of only one of the two restrictions of the Standby Agreements creates a plausible negative

inference that parties did not intend to incorporate the second restriction.  However, it is only an

inference, not an inexorable conclusion.  In the totality of the circumstances of the transaction, I

---

[27]     At his deposition, Green Goblin's principal, John DePrince, testified that he understood
the Proietto Notes to mean that the duty to repay did not arise until either the "cash flow/debt service
ratio" condition was satisfied or the BLC obligation was paid in full.  See John DePrince Deposition at
146-47 (Exhibit "L" to Plaintiff's Motion of Summary Judgment).  This testimony is consistent with, but
contributes only somewhat to my conclusion.  The issue is not what DePrince understood the agreements
to mean.  The issue is whether he and the Proiettos agreed that the limitations on the Proiettos'
enforcement remedies set forth in the Sabertooth Standby Agreement were incorporated into the Proietto-
Green Goblin Note.

find that there is sufficient uncertainty regarding the relationship between the Proietto Notes and

the Standby Agreements to create a triable issue of fact.  This makes it impossible to grant

summary judgment to either Green Goblin or Simons on liability based on the legal theory that

the parties incorporoated Paragraphs 3 and 4 of the Sabertooth Standby Agreement into the

Proietto-Green Goblin Note.[28]

### D.

The remaining issue is whether Green Goblin is entitled to summary judgment on

liability based on its theory that it is a third party beneficiary of the Sabertooth Standby

Agreement between BLC and the Proiettos.[29]  I conclude that it is not.  Further, based on the

summary judgment record, I determine that there are no material facts in dispute and that Green

Goblin was **<u>not</u>** a third party beneficiary of the Sabertooth Standby Agreement between BLC and

the Proiettos.  <u>See</u> Fed. R. Civ. P. 56(d)(1).[30]

---

[28]     Denial of Simons' request for summary judgment with respect to liability, requires that I address his Motion for Partial Summary Judgment on the Issue of Damages.  I will not engage in an extended discussion of that Motion.  Simons asserts that Green Goblin cannot make out its damages claim without identifying the customers it allegedly it lost due to breach of contract it asserts that Simons committed.  Because the Plaintiffs have come forward with some evidence on the issue regarding its alleged lost customers, I find that there is a material issue of fact that precludes the entry of partial summary judgment in Simons' favor on the damages issue.

[29]     Green Goblin also may be contending that it may enforce the Standby Agreements directly.  If so, I do not understand the basis for the argument.  Sabertooth and Green Goblin were not signatories or parties to the Standby Agreements; the Standby Agreements were made by BLC and the Proietto.  Each Standby Agreement referenced Green Goblin and Sabertooth only for the purpose of identifying the Note as to which the Proiettos were to forbear from enforcing pending repayment of the BLC loan.

[30]     Rule 56(d)(1) provides:

(continued...)

39

Under Pennsylvania law,

> [A] party becomes a third party beneficiary only where both parties to the contract express an intention to benefit the third party in the contract itself, unless, [1] the circumstances are so compelling that recognition of the beneficiary's right is appropriate to effectuate the intention of the parties; and [2] the performance satisfies an obligation of the promisee to pay money to the beneficiary, or the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

Blue Mt. Mushroom Co. v. Monterey Mushroom, 246 F. Supp. 2d 394, 401 (E.D. Pa. 2002) (internal citations omitted).

Green Goblin's only argument proffered in support of its contention that it is a third party beneficiary of the Sabertooth Standby Agreement is that it is a party to the Notes and the Notes cross referenced the Standby Agreements, which somehow evidences an intent to benefit the Debtors.  However, there is nothing in the record to support the Debtors' assertion that the parties to the Standby Agreements, BLC and the Proietto, intended to benefit the Debtors.  To the contrary, the Standby Agreements expressly stated that the purpose of the contract was to "induce Business Loan Center, Inc. (Lender) to make an SBA guaranteed loan to Standby Borrower or guaranteed by Standby Borrower  . . . Standby Creditor."  Green Goblin has not come forward with any evidence, such as testimony from the Proiettos or BLC, to overcome this express, written statement of intent found in the writing.

Having presented no other evidence on the issue, Green Goblin has failed not only to

---

[30](...continued)

> If summary judgment is not rendered on the whole action, the court should, to the extent practicable, determine what material facts are not genuinely at issue. The court should so determine by examining the pleadings and evidence before it and by interrogating the attorneys.  It should then issue an order specifying what facts—including items of damages or other relief—are not genuinely at issue. The facts so specified must be treated as established in the action.

establish that the undisputed facts show that it was a third party beneficiary of the Sabertooth

Standby Agreement, it has not even established that there is a disputed issue of fact on the

question.  Once Simons filed his motion for summary judgment, Green Goblin, as the party

bearing the burden of proof,  was obliged to marshal its evidence in support of its claim that it is

a third party beneficiary of the Sabertooth Standby Agreement.  See Newman, 304 B.R. at 193.

Because Green Goblin has not done so, it has not met its burden of proof on the issue.

Consequently, I find that there is no genuine fact issue and that Green Goblin was not a third

party beneficiary of the Sabertooth Standby Agreement.  See Fed. R. Civ. P. 56(d)(1).[31]


## VII.

For these reasons, I will enter an order denying all three motions for partial summary

judgment on liability.  The order will also determine that Green Goblin was not a third party

beneficiary of the Sabertooth Standby Agreement.


**Date:  January 18, 2011**                  _____

                                             **ERIC L. FRANK**
                                             **U.S. BANKRUPTCY JUDGE**

---

[31]    I am well aware that the outcome here differs from my conclusion that there is a disputed issue of fact regarding the incorporation of Paragraphs 3 and 4 of the Sabertooth Standby Agreement into the Green Goblin-Proietto Note.  This is so because the "third party beneficiary" issue involves a determination of the intent of different parties under a different contract  –  the intentions of BLC and the Proiettos, not the intentions of Green Goblin and the Proiettos.  The circumstantial evidence of intent that contributed to my conclusion that there is an issue of fact whether Green Goblin and Proietto intended to incorporate Paragraphs 3 and 4 of the Sabertooth Standby Agreement into the Green Goblin Note has no force in evaluating the intentions of BLC and the Proiettos.  In negotiating with the Proiettos, Green Goblin had every incentive to garner the benefits of the Sabertooth Standby Agreement.  By comparison, there is no evidence to suggest that BLC had any reason to provide Green Goblin with the benefit of the concessions made by the Proiettos demanded by BLC and memorialized in the Standby Agreements.