UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| | : | |
| GREEN GOBLIN, INC., | : | Bky. No. 09-11239 ELF (DISMISSED) |
| | : | |
| Former Debtor. | : | |
| | : | |
| GREEN GOBLIN, INC., | : | |
| | : | |
| Plaintiff, | : | Adv. No. 09-067 |
| | : | |
| v. | : | |
| | : | |
| WARREN SIMONS, | : | |
| | : | |
| Defendant. | : | |

# O P I N I O N

## I.  INTRODUCTION

In this adversary proceeding, Plaintiff Green Goblin, Inc. ("Green Goblin") seeks to hold

Defendant Warren Simons ("Simons"), the assignee of a mortgage and two (2) promissory notes

(collectively, "the Notes"), liable for breach of contract.  Green Goblin contends that Simons

breached the parties' contract by confessing judgment against Green Goblin and commencing

execution on the judgment.  Green Goblin attributes the subsequent decline and loss of its

business to Simons' actions and requests monetary damages for the alleged injury.

The trial of this matter focused on the following question: What were the material terms

of the Notes?  Green Goblin contends that the Notes incorporated the provisions of certain

related, contemporaneous agreements that restricted Simons' right to enforce the Notes (by

confession of judgment or otherwise) and that Simons violated these contractual restrictions.
Simons disputes that he was subject to any contractual restrictions on his collection and
enforcement rights under the Notes.

As set forth more fully below, I agree with Green Goblin that the Notes incorporated
those terms of the related agreements that restricted the Simons' remedies. However, I disagree
with Green Goblin's assumption that these restrictions constituted contractual "promises" that
give rise to damages for breach of contract. Rather, I find that the incorporated terms were
contractual "conditions." Therefore, even though one (1) of the conditions that limited Simons'
exercise of his contractual default remedies did not occur, Simons' premature exercise of those
remedies gave rise only to a defense to the legal actions he instituted, not to an affirmative claim
for breach of contract. Accordingly, Green Goblin's claim fails and judgment will be entered in
favor of Simons and against Green Goblin.

## II. PROCEDURAL HISTORY

Much of the procedural history of this adversary proceeding was recited in the preceding
opinion, which accompanied my ruling denying the parties' cross-motions for partial summary
judgment. See In re Sabertooth, LLC, 443 B.R. 671, 675-79 (Bankr. E.D. Pa. 2011). I will
summarize only those parts of the procedural history necessary to place this dispute in its proper
context.

## A. The Former Debtors' Bankruptcy Cases

Green Goblin and its affiliate, Sabertooth, LLC ("Sabertooth") (collectively, "the Former Debtors" or "the Plaintiffs"), filed voluntary chapter 11 bankruptcy petitions on February 23, 2009. Their bankruptcy cases were jointly administered.[1]

On June 15, 2011, after denying confirmation of the Former Debtors' Fifth Amended Chapter 11 Plan of Reorganization, I dismissed the bankruptcy cases of Sabertooth and Green Goblin, but retained jurisdiction over this adversary proceeding. See In re Smith, 866 F.2d 576 (3d Cir. 1989); In re Stardust Inn, 70 B.R. 888 (Bankr. E.D. Pa. 1987).

## B. The Adversary Proceeding

On March 26, 2009, the Former Debtors instituted this adversary proceeding against the defendants, Warren Simons ("Simons") and Alan Simons, seeking to recover compensatory and punitive damages for breach of contract.[2] In an Amended Complaint filed on April 14, 2009, the Plaintiffs voluntarily withdrew their punitive damages claim. (See Doc. #11). Pursuant to a subsequent stipulation between the parties, Alan Simons was dismissed as a defendant.

In June 2010, the parties filed cross-motions for partial summary judgment and Simons

---

[1]     The Former Debtors' cases were jointly administered with a third affiliated business, Venom, Inc. ("Venom"). Venom filed its chapter bankruptcy petition on January 22, 2009, before the Former Debtors filed. Venom's bankruptcy case was converted to a chapter 7 on February 24, 2010, leaving Sabertooth and Green Goblin as the two (2) remaining, chapter 11 debtors. On September 20, 2010, the chapter 7 trustee filed a no-asset report in the Venom case.

[2]     Initially, Venom, too, was a party plaintiff in the adversary proceeding. Venom was dismissed as a party-plaintiff as a result of the Defendants' Motions to Dismiss the Amended Complaint and Second Amended Complaint. (See Doc. #'s 29, 35).

later filed a second motion for partial summary judgment relating to damages.  I denied all of the

partially dispositive motions[3] and the matter proceeded to trial.

Trial in this matter was bifurcated between the liability and the damages issues.  The

liability trial was conducted on September 8, 2011.[4]


## III. FINDINGS OF FACT

During trial of this proceeding, the parties stipulated to certain facts, and with the consent

of both parties, I agreed to take judicial notice of the facts contained in Part II of the Opinion,

dated January 18, 2011, denying the motions for partial summary judgment.  See Sabertooth, 443

B.R. at 677-79.  The findings below are based on the facts set out in the Sabertooth summary

judgment opinion as well as the evidence presented at the September 8, 2011 hearing.


### A. The Parties

Kevin and Teresa Burke and John DePrince (collectively, "the Principals") own the three

(3) affiliated entities, Venom, Sabertooth, and Green Goblin.  Venom is a corporation that owned

and operated the Principals' initial Gold's Gym franchise in Conshohocken, Pennsylvania.

---

[3]      Sabertooth was dismissed as a party-plaintiff as part of my ruling on the partial motions
for summary judgment.

[4]      On June 30, 2009, prior to dismissal of the Former Debtors' cases, Simons filed a proof
of claim against Venom, that was later amended to assert the claim against all three (3) entities.  Venom
filed an objection to the proof of claim and the claims objection hearing was consolidated with the trial
of this proceeding.  With the dismissal of the Sabertooth and Green Goblin bankruptcy cases and the
closing of the Venom case, the claims objection is moot.

Sabertooth is a Pennsylvania limited liability company formed in July 2000, (Ex. P-17, p. 670),[5]

to purchase and own the real property on which the Principals intended to operate a second

Gold's Gym franchise. Green Goblin is a Pennsylvania corporation created in June 2001, (Ex. P-

17, p. 703), as the intended operating entity for the second Gold's Gym franchise.

Joseph and Anne Proietto ("the Proiettos") were the principals of the King of Prussia

Swim Club, Inc., which owned the personal property ("the Business Assets") and operated a

swim club located at 431 West Valley Forge Road, King of Prussia, Pennsylvania. The Proiettos

owned the real estate and buildings (the real and personal property referred to collectively as "the

Real Property").

In January 2001, the Principals retained Edward J. Hughes, Esquire ("Hughes") to

represent them in negotiating the purchase of the Real Property and the Business Assets. (N.T. at

31). Hughes has been a practicing attorney in Pennsylvania since 1976, and concentrates his

practice in real estate transactions. (N.T. 30). The Proiettos were represented in the Transaction

by Joseph J. Pizonka, Esquire ("Pizonka").


## B. The Sales Transaction

### 1. arranging the financing

Sometime prior to June 2001, the Principals entered into negotiations with the Proiettos

for the acquisition of the Real Property and the Business Assets (hereafter, "the Transaction").

They also entered into negotiations with Harleysville National Bank and Trust Company

---

[5]     Exhibit P-17 was the closing binder of the documents executed during the sale closing
for the Property. The page numbers are references to the bates stamp.

("Harleysville") and Business Loan Center, Inc. ("BLC") to obtain the necessary financing, it

being contemplated that the BLC loan would be guaranteed by the U.S. Small Business

Administration.

　　　As originally contemplated, the Principals expected to obtain sufficient financing from

Harleysville and BLC to pay the Proiettos in full at closing for the Real Property and the

Business Assets.[6] However, the Principals did not qualify for the full amount of the loan they

sought from BLC. In May 2001, the Principals received a commitment letter from BLC to loan

$1.3 million subject to certain conditions. (Ex. P-17, p. 491). As one of the conditions of the

financing, BLC required the sellers (the Proiettos) to finance $600,000.00 in the form of a

subordinated note. (N.T. 86). BLC also required that the subordinated note be on "standby" for

a period of at least two (2) years, and thereafter, the borrowers would be required to meet certain

financial markers before being obliged to make payments on the subordinated note. (Ex. P-17, p.

494). While the Proiettos' subordinated loan also was to be secured by a junior mortgage on the

Real Property, BLC also mandated that the Proiettos defer ("standby") from taking any legal

action to collect on the loan or realizing their collateral before full repayment of the BLC senior

loan.

　　　In mid-May 2001, Greg Poehlmann ("Poehlmann"), on behalf of BLC, set up a meeting

to discuss the terms and conditions of the BLC loan and, in particular, the BLC requirement that

the Proiettos finance $600,000.00 of the purchase price by taking back a subordinated note with

standby requirements. John DePrince, Kevin Burke, and Joseph Proietto attended the meeting.

(N.T. at 86-88).

_____

　　　[6]　　When I refer to the Proiettos in connection with the Transaction, I will not distinguish
between them and their entity, the King of Prussia Swim Club, Inc.

-6-

## 2. the Transaction terms

The Transaction closed on June 26 and 27, 2001.[7]  Sabertooth purchased the Real

Property for $2.5 million. (Ex. P-17, p. 311-25).  Green Goblin purchased the Business Assets

for $600,000.00.  (Id. at 338-64).

Sabertooth and Green Goblin utilized three (3) sources to finance the Transaction:

(1)    Harleysville loaned Sabertooth $1.5 million, secured by a first priority mortgage on the Property;

(2)    BLC loaned Sabertooth and Green Goblin $1.3 million, secured by a second priority mortgage on the Property; and

(3)    the Proiettos financed $600,000.00, through two promissory notes (collectively, "the Proietto Notes" or "the Notes").

As stated earlier, as a condition of the financing, BLC required the Proiettos to consent to

certain restrictions on the timing of the repayment of the $600,000.00 third position loans, as

well as their right to proceed against their collateral.


## 3. The Proietto Notes and the Standby Agreements

The Transaction was documented by a series of contracts which included, inter alia, an

agreement of sale for the Real Property ("the AS"), an asset purchase agreement for the Business

Assets ("the APA"), two (2) promissory notes, a mortgage, and a surety agreement.

Green Goblin executed a promissory note in the amount of $475,000.00 in favor of the

Proiettos ("the Proietto-Green Goblin Note") (Ex. P-17, p. 365), guaranteed by Sabertooth under

a surety agreement.  Sabertooth gave the Proiettos a $125,000.00 promissory note ("the

---

[7]    Some of the Transactional documents are dated June 26, 2001 and others are dated June 27, 2001.  It is not clear from the record whether the closing of the Transaction took place over two (2) days or, instead, whether some of the documents are dated incorrectly.  The issue is not material.

Proietto-Sabertooth Note"). (Id., p. 327). The Proietto Notes and the Sabertooth guarantee of the

Proietto-Green Goblin Note were secured by a third priority mortgage on the Property ("the

Sabertooth Mortgage"). (Id., p. 376). The Sabertooth Mortgage contained a confession of

judgment clause that allowed the Proiettos to confess judgment against Sabertooth in the event of

a default. (Ex. P-18, p. 385).[8]

The two (2) Proietto Notes were substantially similar to each other. Repayment under the

Proietto Notes was to occur:

> in sixty consecutive monthly installments of principal and interest . . . per month
> commencing on the first day of August, 2001 and continuing on the first day of
> each month thereafter, with a final payment of all then outstanding principal and
> all unpaid and accrued interest due and payable on the sixty month anniversary of
> this Note.

(Ex. P-17, pgs. 327, 365).

Each of the Proietto Notes also made specific reference to the related Standby Agreement.

The language used was nearly identical to Paragraph 1 of the Standby Agreements:

> In accordance with a certain Standby Creditors Agreement dated this date and
> executed by Payees (the "Standby Agreement"), no principal or interest payments
> for the first two (2) years from the date of this Notes shall be made and payment
> of principal and interest will be permitted only after the occurrence of: (a) two (2)
> years having passed from the date of the Note and (b) Maker shall show on a
> consolidated basis two (2) years of 1.25:1 cash flow/ debt service coverage as
> defined by generally accepted accounting principles. When principle and interest
> payments are permitted to be made under the Standby Agreement, Maker shall
> pay to Payees all accrued and unpaid interest and principal then due in accordance
> with the Amortization Schedule.

(Id.) (emphasis added).

---

[8]     The Proietto-Green Goblin Note was attached an exhibit to both the APA and the Green
Goblin Standby Agreement. It was also incorporated by reference into the Sabertooth Mortgage.
Similarly, the Proietto-Sabertooth Note was attached to the AS and its respective Standby Agreement. It,
too, was incorporated by reference into the Sabertooth Mortgage.

Both the Proietto-Green Goblin Note and the Proietto-Sabertooth Note (collectively, "the

Proietto Notes") were subject to a Creditor Standby Agreement, which BLC required the

Proiettos to execute.  Each Standby Agreement, provided, in material part:

> To induce Business Loan Center, Inc. (Lender) to make an SBA guaranteed loan
> to Standby Borrower or guaranteed by Standby Borrower . . . Standby Creditor
> agrees:
>
>    1.   To accept payments of principal and interest after the occurrence of :
>
>         a.   two years having passed from the date of closing; and
>
>         b.   Standby Borrower showing on a consolidated basis and
>              acknowledged by Lender, two years of 1.25:1 cash
>              flow/debt service coverage as defined by Generally
>              Accepted Accounting Principles
>
>    3.   To take no action to enforce claims against Standby Borrower on the
>         Standby Loan until Lender's Loan is satisfied.
>
>    4.   To take no action against Standby Borrower's collateral,
>         without written consent from the Lender, until Lender's Loan is
>         satisfied.

(Ex. P-18 p. 4-5, 102-3).


### 4. Hughes' role in drafting the Proietto Notes

Hughes, the Former Debtors' counsel, drafted the Proietto Notes and most of the other

documents for the sales transaction between the Former Debtors' and the Proiettos.  (N.T. at 33,

52-53).[9]  Hughes was the scrivener who added language to the Notes that referenced the Standby

Agreements.  (Id. at 63).  At the time he drafted the Proietto Notes, Hughes intended them to be

---

[9]      Originally, the parties contemplated the Proiettos' financing to be in the form of a single
note secured by the Real Property.  At some point, for reasons that are not clear, it was determined to
allocate the Proiettos' $600,000.00 financing between the Real Property ($125,000.00) and the Business
Assets ($475,000.00).  (N.T. at 45-46).

complete, integrated documents. (Id. at 60).[10]

Prior to closing, Hughes' drafts of the Proietto Notes were sent to Pizonka for his comments and editing. Hughes understood the Notes' references to the Standby Agreements to incorporate the Standby Agreements into the Notes. (Id. at 58-59, 63-64).[11] In their discussions, Hughes and Pizonka discussed the fact that unless the Proiettos agreed to be bound by the Standby Agreements, BLC would not provide financing to the Former Debtors. (Id. at 58).

### C. The Assignment and Confession of Judgment

On April 27, 2006, almost five (5) years after the Transaction closed, the Proiettos assigned the Third Priority Mortgage and the Proietto Notes to Simons for $1.00. (Ex. D-5). At the time of the assignment, neither Green Goblin nor Sabertooth had made any payments to the Proiettos in repayment of the Proietto Notes.

On July 17, 2006, Simons filed a Complaint in Confession of Judgment ("the Confession of Judgment") against Sabertooth in the Pennsylvania Court of Common Pleas, Montgomery County ("the State Court") in the amount of $933,575.14. (Ex. P-1). Contemporaneously with the Confession of Judgment, Simons filed a Praecipe for a Writ of Execution on the Confessed Judgment and a sheriff's sale was scheduled for September 27, 2006. (Id.) A notice of sheriff's sale was posted on the Property. (N.T. at 94).

---

[10]    Hughes further testified that he was aware of the legal distinction between referring to a document and incorporating a document into a contract. (Id. at 61).

[11]    This has been the focal point of this proceeding and by far the most contested issue. Yet, only Green Goblin presented testimony that was uncontradicted on this point. Neither the Proiettos nor Pizonka testified in this proceeding.

Sabertooth filed a Petition to Open and/or Strike the Confession of Judgment on August

14, 2006. Pursuant to the State Court's Order, dated September 21, 2006, Sabertooth filed an

Argument Praecipe on December 13, 2010. (Doc. #145). Sabertooth subsequently filed a

Motion for Relief from the Automatic Stay <u>Nunc Pro Tunc</u> ("the Stay Relief Motion") to allow

the argument to go forward in the State Court. (Bky No. 09-11237, Doc. #200). The Stay Relief

Motion was granted and later expanded to allow Sabertooth to assert any counterclaims it had

under state law. (<u>See</u> Bky. No. 09-11237, Doc. #'s 221, 289).

On March 4, 2011, the State Court granted Sabertooth's Petition to Open and/or Strike

the Confession of Judgment.


## IV. THE PARTIES' CONTENTIONS

Green Goblin argues that it may recover against Simons for breach of the Proietto-Green

Goblin Note on two (2) grounds.[12]

First, according to Green Goblin, Simons breached the terms of the Proietto-Sabertooth

Note by confessing judgment before a condition precedent to payment had occurred. The

condition precedent on which Green Goblin relies is found in the Proietto-Sabertooth Note and

Mortgage: the 1.25:1 cash flow to debt service ratio provision (<u>i.e.</u>, Green Goblin showing on a

consolidated basis two (2) years of 1.25:1 cash flow to debt service coverage as defined by

GAAP) (hereafter, "the Cash Flow Minimum Ratio"). Green Goblin argues that because it never

achieved the Cash Flow Minimum Ratio, no default occurred under either of the Proietto Notes

---

[12]   In the pleadings, Green Goblin argued that it was entitled to recover as a third-party
beneficiary under the Standby Agreements. However, as conclusively determined on summary judgment,
there was no evidence that Green Goblin was a third-party beneficiary of the Standby Agreements and
accordingly, summary judgment on this issue was entered in favor of Simons.

and Simons' actions amounted to a breach of his contractual obligations. This theory assumes,

presumably based on the integrated relationship among the various agreements comprising the

Transaction, that Simons' contractual obligations contained within the Proietto-Sabertooth Note

were incorporated into the Proietto-Green Goblin Note.

Simons disagrees. He contends that the Cash Flow Minimum Ratio provision applied

only during the five (5) year term of the Notes. According to Simons, the loans were in default

once the Proietto Notes matured by their own terms after five (5) years, at which time all

outstanding principal and all unpaid and accrued interest was due and payable. He contends that

the only reasonable way to harmonize the Notes' the Cash Flow Minimum Ratio and maturity

provisions is to treat the Cash Flow Minimum Ratio condition as terminating upon maturity. If

this construction of the Notes is correct, Sabertooth and Green Goblin were in default once the

Proietto Notes matured and his collection efforts took place after the default.

Second, Green Goblin argues that Simons breached the Proietto-Green Goblin Note by

confessing judgment against Sabertooth and moving to execute on the Confession of Judgment

because the Proietto-Green Goblin Note fully incorporated Paragraphs 3 and 4 of the Standby

Agreements (which prohibit Simons from taking legal action against Green Goblin or the Real

Property until BLC has been paid in full). In making this argument, Green Goblin again, relies

upon the integrated nature of the Transaction and the underlying purpose of the contracts as

evidence of the parties' intention to fully incorporate the provisions of the Standby Agreements

into the Proietto Notes.

In disputing Green Goblin's second legal theory, Simons focuses largely on the language

of the Proietto Notes. Simons argues that the Proietto Notes incorporated Paragraph 1 of the

Standby Agreements relating to the two-year deferral of payment and the Cash Flow Minimum

Ratio, but did not make any reference to the critical provisions at issue here, Paragraphs 3 and 4

of the Standby Agreements. Thus, Simons contends that the Notes' general reference to the

Standby Agreements and the express incorporation of only Paragraph 1, raises the negative

implication that the parties did not intend to fully incorporate any other provisions of Standby

Agreements.

## V. DISCUSSION

### A. Applicable Legal Principles:  Breach of Contract

Under Pennsylvania law,[13] to recover for breach of contract, a plaintiff must prove: (1) the

existence of a contract, including its essential terms; (2) a breach of a duty imposed by the

contract; and (3) resultant damages.  Hart v. Arnold, 884 A.2d 316, 332 (Pa. Super. Ct. 2005),

appeal denied, 587 Pa. 695 (2006); J.F. Walker Co., Inc. v. Excalibur Oil Group, Inc., 792 A.2d

1269, 1272 (Pa. Super. Ct. 2002) (quoting Williams v. Nationwide Mut. Ins. Co., 750 A.2d 881,

884 (Pa. Super. Ct. 2000)).  "When performance of an obligation arising under a contract is due,

any failure on the part of the party charged with that obligation amounts to a breach."  In re

Wolfe, 378 B.R. 96, 104 (Bankr. W.D. Pa. 2007) (citing Widmer Engineering, Inc. v. Dufalla,

837 A.2d 459, 467 (Pa. Super. Ct. 2003)).

The burden of proof in a contract action is on the party asserting the breach.  Ferranti

Int'l, PLC v. Jasin, 2001WL 883250, *3 (E.D. Pa. May 25, 2001) (citing East Texas Motor

Freight, Diamond Div. v. Lloyd, 484 A.2d 797, 801 (Pa. Super. Ct. 1984)).  Proof of the breach

---

[13]      The Proietto Notes had identical provisions relating to the choice of law governing the contracts: "This Note shall be governed and construed in accordance with the laws of the Commonwealth of Pennsylvania." (Ex. P-17).

must be shown by a preponderance of the evidence. Ferranti, 2001 WL 883250, at *3 (quoting

Snyder v. Gravell, 666 A.2d 341, 343 (Pa. Super. Ct. 1995)).

Because trial of this proceeding was bifurcated, in order to move to the next stage to

address the resultant damages, if any, Green Goblin must first show by a preponderance of the

evidence that Simons breached the terms of the Proietto-Green Goblin Note. Further

complicating this issue, Green Goblin seeks to treat the restrictions on Simons' ability to collect

under the Proietto Notes contained in the Proietto-Sabertooth Standby Agreement as part of the

Proietto-Green Goblin Note.

## B. Green Goblin's Theory Based on the Cash Flow Minimum Ratio Provision

Green Goblin's first theory of breach of contract requires no extended discussion. The

Proietto-Green Goblin Note conditioned Green Goblin's payments on the occurrence of two (2)

events: (a) two (2) years having passed from the date of the Proietto-Green Goblin Note ("the 2

Year Provision") and (b) the Cash Flow Minimum Ratio.

As the party asserting the breach, Green Goblin had the burden of proving by a

preponderance of the evidence that Simons confessed judgment at a time when Green Goblin

was not in default. Green Goblin has failed to establish that, prior to the confession of judgment,

it had not been operating for at least two (2) years, at or above, the required cash flow to debt

service ratio. There is simply no evidence in the record on the subject and Simons has not

conceded this issue.

Therefore, having failed to establish an essential element of its claim, Green Goblin

cannot prevail on this theory.

## C. Green Goblin's Standby Agreement Theory

Green Goblin's second legal theory is based on the premise that the Proietto-Green Goblin Note was not complete, in and of itself, and that the parties' agreement incorporated certain provisions of the Sabertooth Standby Agreement. Specifically, Green Goblin asserts that, absent BLC's consent, the Proiettos (and their assignee, Simons) were precluded from taking legal action and proceeding against their collateral upon default because Green Goblin had not repaid the BLC $1.3 million note. The source of this prohibition is Paragraphs 3 and 4 of the Standby Agreements. There is no dispute that Simons did not obtain consent from BLC before confessing judgment against Sabertooth and commencing execution against the Real Property in July 2006.

To evaluate the merits of the argument, it is necessary to consider certain additional principles of Pennsylvania contract law, in particular, the parol evidence rule.

### 1. legal principles of contract interpretation

The general rule of interpretation under Pennsylvania contract law is:

> [T]he intent of the parties to a written contract is contained in the writing itself.
> Where the intention of the parties is clear, there is no need to resort to extrinsic
> aids or evidence, instead, the meaning of a clear and unequivocal written contract
> must be determined by its contents alone.

Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc., 247 F.3d 79, 92 (3d Cir. 2001) (internal quotations and citations omitted). Where, as here, "a party seeks to introduce evidence to the court of terms or interpretations of a contract that are not contained within the four corners of the contract itself, the parol evidence rule is potentially implicated." Claret Capital Nominees v. John Benett, 2010 WL 300288, *3 (E.D. Pa 2010).

-15-

The parol evidence rule bars the admission of prior or oral evidence to alter or modify the

terms of a fully integrated, unambiguous contract. E.g., Prior v. Innovative Communs. Corp, 207

Fed. Appx. 158, 162 (3d Cir. 2006) (nonprecedential) (citing Richard A. Lord, Williston on

Contracts §33 (4th ed. 1999) ("Williston")). The application of the parol evidence rule operates

to exclude the evidence only if a contract is fully integrated and unambiguous.[14]

In determining whether the parol evidence bars the admission of evidence to alter or

modify the terms of a contract, courts first determine whether the contract is fully integrated.

Claret Capital Nominees, 2010 WL 300288 at *3; McGuire v. Schneider, Inc., 534 A.2d 115, 118

(Pa. Super. Ct. 1987); Restatement (Second) of Contracts §209(2) (West 2012) ("Restatement")

(whether contract is fully integrated is "a question preliminary to determination of a question of

interpretation or to application of the parol evidence rule").

## 2. integration

Where it appears that a contract is "complete within itself, couched in such terms as

import a complete legal obligation without any uncertainty as to the object or extent of the

[parties'] engagement, it is conclusively presumed that [the writing represents] the whole

engagement of the parties." Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 436 (Pa.

2004) (quoting Gianni v. Russell & Co., 125 A. 791, 792 (Pa. 1924)). Thus, a written contract is

---

[14]    Thus, even if the contract is fully integrated, parol evidence is admissible to clarify an
ambiguity. Bohler-Uddeholm, 247 F.3d at 93. A contractual term or provision is ambiguous if it is
reasonably susceptible to alternate meanings. Id. "To determine whether ambiguity exists in a contract,
the court may consider 'the words of the contract, the alternative meaning suggested by counsel, and the
nature of the objective evidence to be offered in support of that meaning.'" Id. (citing Mellon Bank,
N.A. v. Aetna Bus. Credit, Inc., 619 F.2d 1001, 1011 (3d Cir. 1980)). In this case, the dispute centers on
integration, not ambiguity.

-16-

integrated if it represents a final and complete expression of the parties agreement. <u>Kehr</u>

<u>Packages v. Fidelity Bank, N.A.</u>, 710 A.2d 1169, 1173 (Pa. Super. Ct. 1998) (citing <u>Lenzi v.</u>

<u>Hahnemann University</u>, 664 A.2d 1375, 1379 (Pa. Super. Ct. 1995)); <u>Restatement</u> §209(3)

(written agreement is fully integrated if "in view of its completeness and specificity [it]

reasonably appears to be a complete agreement . . . unless it is established by other evidence that

the writing did not constitute a final expression."). An agreement is partially integrated "if the

writing omits a consistent additional agreed term which ... in the circumstances might naturally

be omitted from the writing." <u>Restatement</u> §216(2).

In determining whether the contract is fully or partially integrated, courts have considered

several factors including, whether the contact contains a merger or integration clause,[15] the length

and detail of the contract, the formality of the setting, and whether the contract is a form. <u>See</u> 6

<u>Corbin on Contacts</u> §25.7 (LexisNexis 2011). Significantly, courts may consider extrinsic

evidence in this inquiry. Thus, a court may look to the prior negotiations or agreements of the

parties, whether oral or written, that were made regarding the contract. <u>Restatement</u> §214(a);

<u>Rempel v. Nationwide Life Ins. Co., Inc.</u>, 370 A.2d 366, 371 (Pa. 1977) ("parol evidence rule is

no bar to oral testimony designed to show that the writing is not an integrated writing"); <u>accord</u>

<u>Kohn v. Kohn</u>, 364 A.2d 350, 353-54 (Pa. Super. Ct. 1976); <u>see also</u> Restatement §210 cmt. b.

("a writing cannot of itself prove its own completeness, and wide latitude must be allowed for

inquiry into circumstances bearing on the intention of the parties"). Once it has been

established that a contract is not fully integrated, the court may again consider extrinsic or parol

---

[15]    <u>Kehr Packages</u>, 710 A.2d at 1173 ("[I]n the absence of an integration clause, the court
'must examine the text [of the agreement] to determine its completeness.'") (quoting <u>Henry v. First Fed.</u>
<u>Sav. & Loan Assoc.</u>, 313 Pa. Super. Ct. 459 A.2d 772, 776 (Pa. Super. Ct. 1983)).

evidence relating to other terms the parties may have agreed to include in their contract.

### 3. the Proietto-Green Goblin Note was partially integrated

Neither of the Proietto Notes or the Standby Agreements contain an integration clause. This is not determinative, but merely requires that the court consider the language of the document in order to evaluate its completeness. See Kehr Packages, 710 A.2d at 1173 (absence of integration clause does not per se subject contract to parol evidence).

The Proietto-Green Goblin Note contains all the crucial terms of the loan agreement including, the principal amount, interest rate, timing and interval of payments, length of the loan, default provisions, and the remedies upon default. See e.g., Morgan v. First Fin. Mortg. Group, Inc., 2005 U.S. Dist. LEXIS 42926 (W.D. Pa. Aug. 22, 2005). But, it also references the Standby Agreements. The additional terms that Green Goblin asserts are part of the agreement are found in those documents. Thus, it is not clear from the face of the document that the parties intended its four (4) corners to fully define their respective rights and obligations.

At trial, Green Goblin presented credible evidence of the alleged oral agreement to supplement the Proietto Notes with the terms of the Standby Agreements. DePrince testified that, in May 2001, after BLC insisted that the Proiettos take back a $600,000.00 note as a condition of its loan and prior to the closing, he met with Burke, Joseph Proietto, and Poehlmann. During the meeting, Poehlmann discussed all the terms of the Standby Agreements including the restrictions on payments to the Proiettos. Subsequently, Hughes, counsel for the Former Debtors, discussed the Standby Agreements with Pizonka prior to the closing and confirmed that the Proietto were willing to go forward with the sales transaction and agreed to be bound the Standby Agreements. Hughes, with Pizonka's input, undertook to revise the language

-18-

of the Proietto Notes to fully incorporate all the terms of the Standby Agreements by referencing

the agreements and quoting specific provisions. The Proietto-Sabertooth Note states: "In

accordance with a certain Standby Creditors Agreement dated this date and executed by Payees .

. . ." (Ex. P-17). It then incorporates, but does not quote directly, paragraph 1 of the Standby

Agreements.

After considering the history of the parties' negotiations, I find that the Proietto-Green

Goblin Note was partially integrated and partially supplemented by the Standby Agreements.

Even though this was a commercial business transaction involving parties represented by

counsel, who engaged in extensive negotiations before agreeing to the final terms of the sale and

lending arrangement, it is apparent that all of the agreements were part of single, unified

transaction. Certainly, the Former Debtors had every incentive to ensure that the Proietto Notes

included remedy restrictions that paralleled those set forth in the Standby Agreements. Further, it

would have been illogical for the Proiettos to negotiate with the Former Debtors for the right to

invoke default remedies under the Proietto Notes that would put them in default of their

obligations to BLC under the Standby Agreements. These considerations make it more likely

than not that Hughes' attempt to redraft the Proietto Notes to incorporate provisions of the

Standby Agreements was an accurate reflection of the parties' intentions.

Also, I perceive the remedy limitations in the Standby Agreements as supplementary to

the Proietto Notes, not contradictory. Paragraphs 3 and 4 of the Proietto-Sabertooth Standby

Agreement did not alter the amount of the loan, the interest rate or the term of the loan. They

merely deferred the Proiettos' right to exercise their default remedies provided by the parties'

agreement. This further supports the conclusion that the Standby Agreements supplemented the

Proietto Notes and that the Notes were not fully integrated.

-19-

In short, in determining the precise terms of the parties' agreement in entering into the

Notes, I may consider both the Standby Agreements as well as other extrinsic evidence without

running afoul of the parol evidence rule because the Proietto Notes were not fully integrated. See

Hall Motor Sales, Inc. v. Studebaker-Packard Corp., 145 F. Supp. 430, 433 (D. Pa. 1956) ("A

prior agreement is not invalidated by the subsequent integration relating to the same subject

matter, if the agreement is not inconsistent with the integrated contract, and is made for separate

consideration, or is such an agreement as might naturally be made as a separate agreement by

parties situated as were the parties to the written contract." (citing Restatement of Contracts

§240)).

Next, I consider whether the parties intended to incorporate all of the remedy restrictions

into the Notes or merely the "two year" and the Cash Flow Minimum Ratio restriction found in

Paragraph 1 of the Standby Agreements.

### 4. incorporation of the terms of the Standby Agreements into the Proietto-Green Goblin Note

The doctrine of incorporation by reference instructs that "where a writing refers to

another document, that other document, or so much of it as is referred to, is to be interpreted as

part of the writing." Shadowbox Pictures, LLC v. Global Enters., Inc., 2006 WL 120030 (E.D.

Pa. Jan. 11, 2006) (quoting Carver v. Global Sports, Inc., 2000 WL 378072, at *3 (E.D. Pa.

2000) (citation omitted)). "It is not necessary that the document incorporated be one to which the

parties to the underlying contract are signatories." Shadowbox Pictures, 2006 WL 120030, at *7

(citing Williston §30.25 (4th ed. 1990)).

Further, where a document has not been expressly incorporated, an additional axiom

-20-

employed in determining whether a contract has nonetheless been implicitly incorporated

instructs that: "[g]enerally, all writings which are part of the same transaction are interpreted

together." Williston §30.25 (citing Restatement §202(2)). Pennsylvania follows this general

rule. See e.g., Krobin Refrigerated Xpress, Inc. v. Pitterich, 805 F.2d 96, 107-08 (3d Cir. 1986)

("[W]here two writings are executed at the same time and are intertwined by the same subject

matter, they should be construed together and interpreted as a whole, each one contributing to the

ascertainment of the true intent of the parties." (citing Von Lange v. Morrison-Knudsen Co., 460

F. Supp. 643, 647-48 (M.D. Pa. 1978), aff'd mem., 609 F.2d 504 (3d Cir. 1979))); accord Black

v. T. M. Landis, Inc., 421 A.2d 1105, 1107 (Pa. Super. Ct. 1980). "If the writings pertain to the

same transaction, it does not matter that the parties to each writing are not the same," Black, 280

Pa. Super. at 625 (citing Von Lange, 460 F. Supp at 648), or that the documents "do not in terms

refer to each other," Monarch Life Ins. Co. v. Estate of Tarone, 2010 WL 331703, *5 (E.D. Pa.

Jan. 26, 2010) (citation omitted).

    The mere reference to the Standby Agreement in the Notes does not, by itself, establish

the parties' intent to incorporate all of the remedy restrictions imposed by the Standby

Agreements. To be sure, Simons has presented evidence that suggests that the parties did not

intend to fully incorporate the provisions of the Standby Agreement. Most significant is the

language of the Proietto-Green Goblin Note itself.

    The text of the Proietto-Green Goblin Note supports Simons' position in three (3) ways.

    First, it paraphrases only Paragraph 1 the Standby Agreement, which includes only the 2

Year provision and the Cash Flow Minimum Ratio provision. Paragraph 1 of the Standby

Agreement does not encompass the prohibition on collection action against Sabertooth while the

BLC loan remains outstanding. The obvious, negative inference that could be drawn is that the

-21-

parties intended to incorporate Paragraph 1 of the Standby Agreement and nothing more.

Second, the potential negative inference is supported by a comparing the relevant text of the Proietto-Green Goblin Note with that of the Sabertooth Mortgage. The Sabertooth Mortgage refers to the accompanying Note as follows: "in accordance with the terms and conditions specified in the Note, all of which are incorporated herein by reference." (emphasis added). This language is in stark contrast to the phrasing in the Proietto-Green Goblin Note which says only "in accordance with a certain Standby Creditors Agreement," and nowhere employs the word "incorporate."[16]

Third, the Proietto-Green Goblin Note refers to a " Standby Agreement" in the singular; it did not refer in the plural to two (2) Standby Agreements, suggesting that the Proietto-Green Goblin Note is referring only to the Green Goblin Standby Agreement, not the Sabertooth Standby Agreement. This is significant because all of Simons' collection activity was directed against Sabertooth, not Green Goblin.

Hughes' testimony as well provides at least some support for Simons' position. He testified that he did not recall witnessing Pizonka telling the Proiettos that the Standby Agreements were incorporated into the Proietto Notes or telling them that the Notes were subject to all the terms of the Standby Agreements. (N.T. 62). Hughes further testified that he did not recall any instance in his own conversations with Pizonka regarding the Proietto Notes where Pizonka used the word "incorporate." (Id. at 62).

Based on the foregoing evidence, Simons' suggested interpretation of the Proietto-Green Goblin Note is certainly plausible. Nevertheless, even taking into account the textual infirmities

---

[16]    Hughes was the scrivener of both the Sabertooth Mortgage and the Proietto Notes.

in the Proietto-Green Goblin Note, I find that the parties intended to include in the Proietto-

Green Goblin Note the restrictions on the Proiettos remedial rights set forth in Paragraphs 3 and

4 of the Sabertooth Standby Agreement.

The Transaction was designed to be and was an integrated commercial loan transaction.

The Proietto-Green Goblin Note was only one (1) of a group of related contracts all of which

were executed to complete the closing on a multi-party commercial sales transaction that

included two (2) commercial banks as lenders, the Proiettos as a private lender, Venom and

Sabertooth as corporate guarantors and the Principals as personal guarantors. In order to protect

its second priority mortgage on the Property, BLC required as a condition of granting its loan that

the Proiettos subordinate the take back loan and that it be on standby. To that end, the Proiettos

entered into the Standby Agreements which not only restricted repayment of the Proietto Notes

but also limited the Proiettos' exercise of any legal remedies with respect to the Proietto Notes

until BLC was paid in full. Without the Standby Agreements, the loan between BLC and the

Former Debtors would not have closed.

The record makes clear that the parties discussed the terms and scope of the Standby

Agreements at the May 2001 meeting and Joseph Proietto agreed to be bound according to those

terms. As stated earlier, when he drafted the Proietto Notes, Hughes believed that he was

incorporating the terms of the Standby Agreements in revising the Notes to make reference to the

Standby Agreements. His execution of his task (i.e., his actual drafting) may have been faulty,

but there is no reason to believe that the Proiettos thought that text of the Proietto Notes was

intended to draw a distinction between the Proietto Notes and the Standby Agreements. The

Proiettos were told at the meeting in May 2001 that they would have to execute Standby

Agreements, pursuant to which they would be deferring the right to be repaid as well as their

-23-

right to exercise contract default remedies; otherwise, BLS would not provide the necessary

financing.  Why would the Proiettos expect that the Proietto Notes, which made reference to the

Standby Agreements, would authorize them to take collection action that would place them in

breach of their obligations to BLC under the Standby Agreements?  There is no evidence that

suggests that the Proiettos or the Former Debtors drew any such counterintuitive distinction

between the Proietto Notes and the Standby Agreements.

Based on the structure of the Transaction and the extrinsic evidence regarding the parties'

pre-closing negotiations, I conclude the Proietto Notes and the Standby Agreements (including

Paragraphs 3 and 4) must be read together to determine the parties' respective rights under the

Notes.

### 5. Construction of the Contract

Up to this point in the Opinion, I have engaged in the process of contract interpretation.  I

have attempted "to ascertain the meaning or meanings of the symbolic expressions [i.e., the

writings] used by the parties" in the Transaction to manifest their agreements.  Edwin W.

Patterson, The Interpretation and Construction of Contracts, 64 Colum. L. Rev. 833 (1964)

("Patterson").  I have determined that the parties intended to include in the Proietto-Green Goblin

Note the temporal restrictions on the Proiettos' remedial rights set forth in Paragraphs 3 and 4 of

the Sabertooth Standby Agreement.  However, before I can determine whether Green Goblin has

made out its claim for breach of contract, I must engage in one last exercise − that of contract

construction.

One court has explained the difference between contract interpretation and contract

construction as follows:

-24-

Construction of a contract determines its legal effect. "Construction . . . is a process by which legal consequences are made to follow from the terms of the contract and its more or less immediate context, and from a legal policy or policies that are applicable to the situation."

Berg v. Hudesman, 801 P.2d 222, 226 (Wash. 1990) (quoting Patterson, 64 Colum. L. Rev. at 835); see also Williams v. Metzler, 132 F.3d 937, 947 (3d Cir. 1997) (construction involves determining the legal effect an agreement will have on an event the parties did not foresee).

Contract construction is determinative in this dispute.

Green Goblin has maintained throughout the course of this proceeding that Paragraphs 3 and 4 of the Standby Agreements were promises, the breach of which gave rise to an affirmative claim.[17] If however, contrary to Green Goblin's position, the provisions of the Standby Agreements that were incorporated into the Proietto Notes are mere conditions and not independent duties of the Proiettos (and by assignment to Simons), then Green Goblin may not recover on the incorporated provisions of the Standby Agreement because no breach of a contractual promise occurred.

Several legal principles come into play in construing the Proietto-Green Goblin Note.

According to the Restatement, a condition is "an event, not certain to occur, which must occur . . . before performance under a contract becomes due." Restatement §224; accord Shovel Transfer & Storage v. Pa. Liquor Control Bd., 739 A.2d 133, 139 (Pa. 1999). "Whether words constitute a condition or a promise is a matter of the intention of the parties to be ascertained from a reasonable construction of the language used, considered in light of the surrounding

---

[17]    Green Goblin has not been entirely consistent in taking that position. Without overstating its significance, I note that throughout its Second Amended Complaint, Green Goblin characterized the Standby Agreement limitations on the Proiettos' (and Simons') collections remedies as "conditions precedent." (Second Amended Complaint ¶¶21, 24, 25, 30, 39, 65, 77) (Doc. #31).

circumstances." <u>Burger King Corp. v. Family Dining, Inc.</u>, 426 F. Supp. 485, 492 (E.D. Pa.

1977) (citing <u>Feinberg v. Automobile Banking Corporation</u>, 353 F. Supp. 508, 512 (E.D.

Pa.1973) and Williston §§ 665, 666); <u>accord</u> <u>In re Columbia Gas Sys.</u>, 50 F.3d 233, 241 (3d Cir.

1995) (citing E. Allen Farnsworth, 2 Farnsworth on Contracts § 8.4, at 366 (1990)). "Where

words in a contract raise no duty in and of themselves but rather modify or limit the promisees'

right to enforce the promise such words are considered to be a condition." <u>Burger King Corp.</u>,

426 F. Supp. at 492.

Whether a provision in a contract is a promise or a condition is significant in its legal

effect. The non-occurrence or failure of a condition "is <u>not</u> a breach by a party unless he is under

a duty that the condition occur." <u>Columbia Gas Sys.</u>, 50 F.3d at 241 (emphasis added). Thus, if

a condition fails to occur, there is no breach of contract that subjects the non-performing party to

damages unless there was an independent promise to perform the condition. <u>Id.</u>

Based the testimony and the documents taken as a whole, I conclude that the provisions

of the Standby Agreements operated as conditions within the Proietto Notes.

The Proietto-Green Goblin Note was a standard promissory note, albeit with certain

limitations on the Proiettos' exercise of their collection remedies. The Proiettos fulfilled their

end of the bargain by lending the money which triggered Green Goblin's legal duty to repay the

loan. The Proiettos retained their legal remedies in the event of a breach. The provisions of the

Standby Agreements incorporated into the Proietto-Green Goblin Note simply addressed <u>when</u>

those remedies could be utilized. The events that had to occur before the Proiettos could lawfully

demand payment or exercise their default remedies were conditions, not independent legal duties

undertaken by the Proiettos in favor of the Former Debtors.

The evidence regarding the source and derivation of the various restrictions on the

-26-

Proiettos' collection rights under the Proietto Notes strongly suggests that the Proiettos made no

affirmative promise to the Former Debtors.  BLC demanded those restrictions as a condition of

entering into the financing arrangement in order to protect its second position mortgage on the

Property and to maximize its ability to obtain repayment of its loan.  Through the Standby

Agreements, the Proiettos made contractual promises to BLC, not the Former Debtors, and there

is no evidence that the restrictions on the Proiettos collection rights mandated by the Standby

Agreements were intended to benefit the Former Debtors.  Therefore, when considered in

context, when the Standby Agreement restrictions were included as limitations in Proietto Notes,

they were not affirmative promises made by the Proiettos to the Former Debtors.  Rather, their

incorporation was designed merely to harmonize the provisions of the Proietto Notes with the

Standby Agreements.  As such, the restrictions functioned as conditions on the Proiettos'

exercise of their right to repayment under the Notes.

The foregoing analysis is supported by the text of the Proietto-Green Goblin Note.  The

operative words of the Proietto-Green Goblin Note state that in accordance with the Standby

Agreement, payment of principal and interest is permitted only "after the occurrence" of two (2)

years and the achievement of the Cash Flow Minimum Ratio.  In the next sentence, the Note

states that "[w]hen" principal and interest payments are permitted to be made under the Standby

Agreement, all accrued interest and unpaid principal must be paid.  Both of these quoted terms

are restrictions based on either the passage of time or events that may or may not occur.  This is

the wording of a condition, not a promise.  Had these intended to be affirmative obligations, it

would have been simple for the scrivener to have made those obligations clear.[18]

---

[18]     For example, each Note could have stated plainly that the Proiettos "promise" not to
exercise their remedies until certain events occurred or that the exercise of the remedies prior to the
(continued...)

### 5. the implied duty of good faith and fair dealing

The consequence of my analysis is that even though Simons acted without authority under the Proietto-Green Goblin Note (because a condition for the exercise of his contractual remedy, full payment of the BLC loan, had not occurred), Green Goblin's affirmative contract claim is not viable.

This bring us to the "elephant in the room." If a contract conditions the exercise of a remedy and one party invokes those remedies before the condition has occurred, is that party liable for acting prematurely? Has that party breached a promise not to invoke those remedies until the condition has occurred?

While there might be situations in which a contract includes an affirmative promise not to act until the a condition precedent has occurred, as discussed earlier in the text, black letter law suggests that, ordinarily, the non-occurrence of a condition is not an implied promise not to act and does not give rise to breach of contract claim if a party prematurely invokes a contract remedy. To conclude otherwise would obliterate the distinction between conditions and promises.

At first blush, this outcome might seem unfair to the party wrongfully subjected to remedial action before the contract conditions authorized such action. However, that is one aspect of "the American Rule," a principle deeply embedded in our jurisprudence. See generally Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240 (1975) (in absence of a statutory fee-shifting provision, courts follow "the American Rule," pursuant to which each party bears its own legal expenses in litigation).

---

[18](...continued)
occurrence of the events "shall constitute a breach" of the Proiettos' obligations under the Note.

Moreover, the aggrieved party may not always be without a remedy. Depending upon the

facts of the case, a claim may arise either for some type of tort, see 42 Pa. CS. §§8351-54, or on a

contract theory, perhaps based on an asserted breach of the implied duty of good faith and fair

dealing found in every contract under Pennsylvania law, see, e.g., Creeger Brick & Bldg. Supply,

Inc. v. Mid-State Bank & Trust Co., 560 A.2d 151, 153-54 (1989) (citing Restatement §205)).

In this case, Green Goblin did not assert any such claims.

Throughout the litigation, Green Goblin conceded candidly that it could assert no tort

claims against Simons because the statute of limitations had run on such claims.

As for legal theories based on contract, Green Goblin never asserted a contract claim

based on breach of the implied duty of good faith and fair dealing. In Paragraph 65 of the

Second Amended Complaint, Green Goblin alleged that due to incorporation of the Standby

Agreements into the Proietto Notes, Simons was "obligated to standby . . . and not attempt any

collection procedures . . . until certain and specific conditions precedent were met." (Doc. # 31).

As I read this allegation, Green Goblin asserted that Simons violated an express contractual

promise, not the implied duty of good faith and fair dealing. The two types of contract breaches

involve different legal theories and proof. The former is a traditional contract claim in which the

plaintiff must prove the existence of the contractual promise, its breach and the resulting

damages – the analysis I have employed in this Opinion. By comparison, the duty of good faith

and fair dealing involves proof that the defendant did not "enforce[] . . . the contract terms in a

manner that is consistent with the parties' reasonable expectations." Killian v. McCulloch, 850

F. Supp. 1239, 1250 (E.D. Pa. 1994).

To some extent, Green Goblin "subconsciously" may have been attempting to assert a

claim based on the implied duty of good faith and fair dealing. (E.g., N.T. at 92 ("Mr. Frank:

We're . . seeking to pin responsibility for liability today . . . on Mr. Simons for his what we believe to be bad acts")).  However, this theory was not in its Complaint.

As early as January 2011, Green Goblin was aware that I interpreted the Second Amended Complaint as putting forward a contract claim based solely the theory that Simons breached an express contractual provision, making any inquiry into Simons' state of mind and reasons for asserting his contractual remedies irrelevant.  See Sabertooth, 443 B.R. at 687.  Yet, at no time, did Green Goblin move to amend its Complaint.  Green Goblin did not articulate a breach of contract claim theory based on the implied duty of good faith and fair dealing at the July 27, 2011 hearing on Simons' motion in limine, when the scope of Green Goblin's contract claim was at issue.  (See Doc. #'s 180, 181).[19]  Nor did Green Goblin raise this theory at the September 8, 2011 trial  –  even in response to evidentiary objections based on relevancy, (see N.T. at 20, 92-94).  In these circumstances, I conclude that the claim is not before the court.

---

[19]    I have reviewed the audio of that hearing.  The evidence that Simons sought to exclude related to his knowledge and state of mind in 2006, when he confessed judgment and commenced execution.  I engaged Green Goblin's counsel in a long colloquy regarding the relevancy of such evidence.  In the course of our discussion, I expressed the view that the evidence was not relevant because it did not appear to relate to what appeared to be the only factual issue in the case, i.e., Green Goblin's and the Proiettos' intentions in entering into the loan agreement.  During the course of this interchange, counsel did not articulate any claim based on a breach of the implied duty of good faith and fair dealing.  As a result, I granted Simons' motion in limine and excluded some of the evidence Green Goblin wished to present.  (See Doc. # 181).

## VII. CONCLUSION

For the reasons set forth above, Green Goblin has failed to establish that the Defendant Warren Simons breached the Proietto-Green Goblin Note.  Judgment will be entered in favor of the Defendant Warren Simons and against the Plaintiff Green Goblin, Inc.

Date:   __May 11, 2012__                    _____

**ERIC L. FRANK**
**U.S. BANKRUPTCY JUDGE**

-31-